## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VANTALIE NGUYEN, On Behalf of Herself and All Others Similarly Situated,<br><br>                                 Plaintiff,<br><br>          v.<br><br>FXCM INC., FOREX CAPITAL MARKETS, LLC, FXCM HOLDINGS, LLC, DROR NIV, WILLIAM AHDOUT, JOHN DITTAMI, and EFFEX CAPITAL, LLC,<br><br>                                 Defendants. | Case No. _____<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Vantalie Nguyen, by her attorneys, except for her own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of publicly-released regulatory filings and reports of FXCM Inc. ("FXCM Inc." and, together with Forex Capital Markets, LLC ("Forex Capital") and FXCM Holdings, LLC ("FXCM Holdings"), "FXCM"), as well as press releases and other public statements issued by FXCM, and media reports about FXCM. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action for defendants' breaches of fiduciary duty and duty of best execution, the aiding and abetting thereof, breach of contract, breach of the implied covenant of good faith and fair dealing, gross negligence, unjust enrichment, and violations of the Commodities Exchange Act, 7 U.S.C. § 1 et seq. (the "CEA"), on behalf of all customers of FXCM who, between March 1, 2010 and February 6, 2017 (the "Class Period"), placed trade

orders through FXCM's "No Dealing Desk" platform while FXCM publicly maintained that FXCM had no conflict of interest in the outcome of that trade.

2.      At all times relevant to this Complaint, FXCM Inc. was a holding company whose only asset was an equity interest in FXCM Holdings, of which it was the sole managing member.

3.      At all times relevant to this Complaint, FXCM Holdings was a holding company that was the immediate corporate parent of Forex Capital.

4.      At all times relevant to this Complaint, Forex Capital acted as, among other things, a Futures Commission Merchant, Registered Foreign Exchange Dealer, Forex Dealer Member, and provisionally registered swap dealer, as registered with the United States Commodity Futures Trading Commission (the "CFTC") and the National Futures Association ("NFA").

5.      During the Class Period, FXCM was engaged in a willful and pervasive scheme to falsely solicit its retail foreign exchange ("forex") customers into transacting with FXCM. Specifically, FXCM promised customers who transacted on its "No Dealing Desk" platform ("NDD") that their trades would be free from conflict from FXCM being on the other side of the trade.

6.      Despite its consistent claims that it would have no conflicts of interest when its retail customers traded using FXCM's No Dealing Desk platform, FXCM, in fact, had an undisclosed financial interest in the market maker, defendant Effex Capital, LLC ("Effex"), that consistently "won" the largest share of FXCM's NDD trading volume.  In fact, Effex, was nothing more than a front for FXCM, allowing FXCM to hold positions opposite its customers (despite its statements to the contrary) and financially benefit at its customers' expense.

7.      Further, FXCM also manipulated the platform to the benefit of Effex (and, in turn, itself) by agreeing to favor Effex over other market maters in routing retail customer orders while

also permitting Effex to win all "ties" with other market makers. These actions, along with FXCM's provision of a real-time view of price quotations offered by other market makers and FXCM's addition of smaller markups to Effex prices than to prices provided by other market makers, improperly ensured that the bulk of FXCM's order flow would be directed to Effex, enriching both Effex and FXCM in the process.

8.    As a result of its favorable treatment by FXCM, Effex would remit a kickback in the form of a monthly "liquidity rebate" to FXCM – amounting to a nearly $80 million kickback to FXCM between 2010 and 2014 and which, upon information and belief, continued through 2016. FXCM was also entitled to a share of Effex's trading profits, earned at the expense of FXCM's customers.

9.    As a result of this order routing manipulation, FXCM caused material harm to Plaintiff and the Class (defined herein) in the form of economic loss due to their orders going unfilled, underfilled, filled at a suboptimal price, and/or filled in a manner which adversely affects the order's performance post-execution. As a result of the kickbacks and its share of Effex's profits, FXCM was unjustly enriched at the expense of its customers to whom it owed a fiduciary duty of loyalty.

10.    On February 6, 2017, the CFTC filed an Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions against Forex Capital, FXCM Holdings, Dror (Drew) Niv, and William Ahdout (the "CFTC Order"). The CFTC Order is attached hereto as Exhibits A and is incorporated by reference.

11.    On February 6, 2017, the NFA Business Conduct Committee issued an order, accepting the settlement offer of Forex Capital, William Ahdout, Dror Niv, and Ornit Niv (the

"NFA Order" and, together with the CFTC Order, the "Regulator Orders"). The NFA Order is attached hereto as Exhibit C and is incorporated by reference. Plaintiff hereby seeks to recover on behalf of herself and all similarly-situated clients of FXCM the value they lost on account of the self-interested practice of order routing described herein as well as disgorgement of the proceeds of the wrongful conduct unjustly retained by Defendants.

## JURISDICTION AND VENUE

12.      This action arises under Section 22 of the CEA, 7 U.S.C. § 25, and common law.

13.      This Court has subject matter jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1337 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000 and Plaintiff is a citizen of a different state than Defendants.

14.      Further, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District.  During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires and the U.S. mail, to effectuate their illegal scheme.

15.      The Court has personal jurisdiction over each Defendant, because Defendants' collusive and manipulative acts took place, in substantial part, in New York specifically and in the United States, generally.  These acts were conducted by persons and entities subject to the laws of the United States, including New York, as well as other states and territories.  Further, Defendants' complained-of acts were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District and throughout the United States.  These connections between the alleged conduct and New York are demonstrated herein.

16.     Venue is proper in this District pursuant to Section 22(c) of the CEA, 7 U.S.C §25(c) and 28 U.S.C. § 1391(b), (c), and (d).  One or more of the Defendants resides, transacts business, is found, or has agents in this District, a substantial part of the events giving rise to Plaintiff's claims arose in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## PARTIES

17.     Plaintiff engaged in several forex transactions through FXCM's "No Dealing Desk" platform during the Class Period and has been injured in their business or property by reason of Defendants' violations of law as alleged herein. Plaintiff is a citizen of California.

18.     Defendant FXCM Inc. was a Delaware corporation with a principal place of business located at 55 Water Street, Floor 50, New York, New York.  During the Class Period, FXCM Inc. was a holding company whose sole asset consisted of an equity interest in FXCM Holdings, of which it was the sole managing member.  Following the release of the Regulator Orders, FXCM Inc. changed its name to Global Brokerage, Inc.

19.     Defendant FXCM Holdings was a Delaware-incorporated holding company that, during the Class Period, was the immediate corporate parent of Forex Capital.

20.     Defendant Forex Capital offered trading platforms for foreign currency contracts.

21.     Unless otherwise defined, as used herein, "FXCM" refers to FXCM Inc., FXCM Holdings, Forex Capital, and any of their subsidiaries, either individually or collectively.

22.     Defendant Dror Niv ("Niv") was one of the original founding partners of FXCM and, during the Class Period, the Chief Executive Officer of FXCM Inc.  Upon information and belief, Niv is a resident of the state of Connecticut.

23.    Defendant William Ahdout ("Ahdout") was one of the original founding partners of FXCM and, during the Class Period, the Managing Director and Chief Dealer of FXCM.  Upon information and belief, Ahdout is a resident of the state of New York.

24.    Defendants Niv and Ahdout are collectively referred to herein as the "Management Defendants."

25.    Defendant John Dittami ("Dittami") is the Chief Executive Officer of Effex and a former employee of FXCM.

26.    Defendant Effex is a Delaware limited liability company with its principal place of business located in Jersey City, New Jersey.

27.    Defendants Dittami and Effex are collectively referred to herein as the "Effex Defendants."

## FACT ALLEGATIONS

### I.    The Forex Market

28.    The forex market is the largest and most actively traded financial market in the world, with global forex trading averaging $5.1 trillion per day in April 2016, alone. *See* BIS Trinneial Central Bank Survey, Foreign Exchange Turnover in April 2016: Monetary and Economic Dept. (Sept. 2016) (*available at* http://www.bis.org/publ/rpfx16fx.pdf).  The Bank of International Settlements engages in a central bank survey every three years to monitor the global forex market.  The most recent survey was conducted in April 2016.

29.    There are numerous players in the forex Market, including dealers, commercial and investment banks, securities houses, mutual funds, pension funds, hedge funds, proprietary trading firms, currency funds, money market funds, other investment funds, building societies, lending companies, insurance companies, reinsurance companies, endowments, central banks, sovereign

wealth funds, international financial institutions of the public sector, retail aggregators, non-financial corporations, non-financial government entities, and private individuals.

30.     Trading in the forex market is done either over-the-counter ("OTC") directly with a counterparty, or on a centralized exchange.  During the Class Period, more than 95% of all forex transactions occurred OTC.

31.     Currencies are purchased and sold in pairs.  The price to buy or sell a given currency pair is reflected by its exchange rate.  The term "currency pair" highlights the fact that all foreign exchange transactions are simultaneously the purchase of one currency and the sale of another.

32.     As of April 2016, the US Dollar remained the world's dominant currency, appearing on one side of 88% of all trades for the month. In April 2016, the top three currency pairs in the world were USD/EUR (23.0%), USD/JPY (17.7%), and USD/GBP (9.2%).

33.     While there are several types of forex-related transactions or instruments a customer can execute, the most important is a spot transaction.  In a spot transaction, the parties enter into an agreement to exchange sums of currency at an agreed-on exchange rate on a value date that is within two bank business days' time.  The forex market revolves around spot transactions because spot rates are the foundation for pricing all forex instruments.

## II.      Spot Transactions

34.     Spot transactions are the simple exchange of one currency for another.  In the forex market, these transactions occur OTC rather than through a central exchange.  As a result, these transactions are reliant on a financial institution or "market maker" who provides liquidity to the market by acting as a dealer willing to continuously buy and sell currencies.

35.     The market maker in the forex spot market quotes prices at which it stands ready to buy or sell the currency.  The quote consists of a bid and an ask on a designated quantity of currency.  The bid is the price at which the market maker is willing to buy the indicated quantity

of currency while the ask is the price at which the market maker is willing to sell the indicated quantity of currency.

36.    Market makers generally provide price quotes to four decimal points, with the final digit known as a "percentage in point" or "pip."

37.    The difference between the bid and ask is the "bid-ask spread" and is the primary way in which a market maker is compensated.

38.    Customers execute forex spot transactions either by a telephone call or electronic message to a salesperson at a market marker bank, through an electronic communications network, a computer system that customers can use to execute orders with dealers over a network.  These platforms include single-bank proprietary platforms operated by market makers or multi-bank dealer systems like that operated by FXCM.

## III.    The Forex Market is Dominated by Large Financial Institutions Who Often Play the Role of Market Maker

39.    During the Class Period the forex landscape was dominated by several large banks. For instance, according to *Euromoney*'s annual survey, in 2016, the largest ten banks collectively controlled approximately 67% of the total forex market:

| Forex Market Share (%) | |
|---|---|
| Citi | 12.9 |
| JP Morgan | 8.8 |
| UBS | 8.8 |
| Deutsche Bank | 7.9 |
| Bank of America-Merrill Lynch | 6.4 |
| Barclays | 5.7 |
| Goldman Sachs | 4.7 |
| HSBC | 4.6 |
| XTX Markets | 3.9 |
| Morgan Stanley | 3.2 |
| *Total Market Share* | 66.9 |

40.     This dominance by the largest banks is magnified in the forex spot market. In 2013, according to the New York Federal Reserve, the ten firms reporting the highest volumes of market share in the U.S. market accounted for 98% of the total market share. *See* https://www.newyorkfed.org/medialibrary/media/markets/pdf/2013triennialreport.pdf; *see also* https://www.newyorkfed.org/medialibrary/media/markets/pdf/2016triennialreport.pdf.     Similar dominance occurred in other years and throughout the Class Period.

## IV.     The Forex Market is Unregulated and Opaque

41.     Despite its size and importance, the forex market is one of the world's least regulated financial markets as most transactions occur OTC, away from regulation and scrutiny by the exchanges.

42.     There is also no centralized exchange or institution that collects and posts real-time trade information for the OTC market.  Instead, these transactions occur on proprietary dealing platforms that match market makers with buyers, with real-time order flow and data often closely guarded.  This substantially limits knowledge of traders' conduct inside these dealing platforms or information among the market makers themselves as to one another's doings.

43.     The potential for abuse here is great, as the "black box" dealing platforms provide the necessary insulation for bad actors to manipulate the market for their benefit.

## V.     FXCM's Business and its Place in the Forex Market

44.     FXCM described itself to customers and investors as an "online provider of foreign exchange ('forex') trading and related services . . . offer[ing] [its] customers access to the over-the-counter ('OTC') forex markets [through] a proprietary technology platform." *See* FXCM 2015 Annual     Report     (*available     at* https://www.sec.gov/Archives/edgar/data/1499912/000149991216000015/fxcm-20151231x10k.htm).

9

45.     FXCM engaged its customers through the "agency model" where customers executed trades on the purported best price quotation offered by FXCM's forex market makers, with FXCM acting as a credit intermediary who simultaneously entered into offsetting trades with both the customer and the market maker.  These agency model-based transactions were held out to customers as occurring through FXCM's "No Dealing Desk" (NDD).

46.     According to FXCM, for trades on the NDD, FXCM was simply a price aggregator, "tak[ing] the best available bid and best ask prices from [its] liquidity providers and stream[ing] those prices to the platforms [FXCM] provides. . . FXCM's liquidity providers include global banks, financial institutions, and other market makers.  This large, diverse group of liquidity providers is one of the things that make this model special."

47.     FXCM purportedly made money from NDD platforms through the spread, adding a small markup to the bid/ask quotes received from its customers and liquidity providers and keeping that amount for itself as a "finder's fee" for its execution of the offsetting transactions.

48.     The NDD model stands in direct contrast to the "principal" or "Dealing Desk" model where FXCM maintains its trading position and does not offset the trade with another party on a one for one basis.

49.     At all times relevant hereto, FXCM purported to "manage [its] dealing desk exposure with strict position and loss limits, active monitoring and automation available for quick and seamless transitions of flow to the no dealing desk model should [it] decide to limit [its] risk exposure. [FXCM] also restrict[ed its] dealing desk offering to smaller and less active clients as well as to select currency pairs."

50.     With respect to its relationships with wholesale forex market makers and prime brokers, FXCM represented:

10

We have entered into prime brokerage agreements with Citibank ("Citi"), Morgan Stanley and Barclays Bank for our retail trading, which we believe allow us to maximize our credit relationships and activities while improving efficiency. As our prime brokers, these firms operate as central hubs through which we transact with our forex market makers. Our prime brokers allow us to source liquidity from a variety of executing dealers, even though we maintain a credit relationship, place collateral, and settle with a single entity, the prime broker. We depend on the services of these prime brokers to assist in providing us access to liquidity through our wholesale forex market makers. In return for paying a modest prime brokerage fee, we are able to aggregate our trading exposures, thereby reducing our transaction costs and increasing the efficiency of the capital we are required to post as collateral. Our prime brokerage agreements may be terminated at any time by either us or the prime broker upon complying with certain notice requirements. We are also obligated to indemnify our prime brokers and certain CFD market makers for certain losses they may incur.

We typically also enter into Master Trading Agreements (such as International Swaps and Derivatives Association or "ISDA" agreements, Futures Master Agreements, or Prime Broker Agreements) with each financial institution that we have a liquidity relationship with. These standardized agreements are widely used in the interbank market for establishing credit relationships and are typically customized to meet the unique needs of each liquidity relationship. These Master Trading Agreements outline the products supported as well as margin requirements for each product. We have had a number of key liquidity relationships in place for over five years and as such we believe we have developed a strong track record of meeting.

51.     FXCM has experienced sustained growth in its active customer base in recent years,

seeing its number of active global user increase from 136,000 in 2011 to over 178,000 as of

December 31, 2016.

## VI.     As an Inducement to Customers, FXCM Advertises Its No Dealing Desk and "Better Execution"

52.     At all times relevant hereto, FXCM promoted its "acclaimed execution" – pointing

to its NDD as innovating "transparency in the forex market with the competitive and market-

driven" NDD execution.

53.     Archived versions for FXCM's website confirm such representations.     For

example,     as     of     March     27,     2010,     FXCM's     homepage     (*available     at*

https://web.archive.org/web/20090327045255/http://www.fxcm.com/) advertised its "No Dealing

Desk Execution:"



54.    FXCM made similar representations on its website as of January 2011 (*available*

*at* https://web.archive.org/web/20101231144600/http://www.fxcm.com/fxcm-forex-

execution.jsp) where it claimed that:

> FXCM makes an identical amount of money in the form of pip markups (which are
> really commissions) regardless of whether the customer made or lost money on the
> account. FXCM receives prices from global banks, financial institutions, and other
> market makers in the foreign exchange markets. A best bid/offer engine sorts those
> prices and marks them up with our standard markup on the majors. This markup
> acts as the commission on the trade. When a customer clicks on a price, they are
> actually clicking on a price from the bank that currently has the best bid or offer,
> plus our markup. Given that we make money on a per trade basis, we are motivated
> to encourage size and high frequency and it is why we offer extra incentives to
> clients. It's also why we dedicate a lot of resources in trying to improve client
> profitability so they have the money to stay around and trade in bigger sizes. We
> don't benefit from customer losses.

55.    FXCM further promised in January 2011 (*available at*

https://web.archive.org/web/20101231144600/http://www.fxcm.com/fxcm-forex-

execution.jsp#NDDSection3) that its customers would be anonymous when dealing with market makers:

> **Anonymity** - Another key difference when trading through FXCM's No Dealing Desk model is that all orders reside on FXCM servers and are sent to market makers as market orders only. One again, let's use an example. Let's say you buy the market at 1.4550 with a stop at 1.4530 and a limit at 1.4600. With FXCM, your stop and limit reside on our server. At no time do banks see where these orders sit. If the market moves down through your stop, FXCM's system sends your order to the market maker as a market order and execution takes place at the next available price.
>
> * * *
>
> 10.  CAN BANKS SEE MY ORDERS?
>
> **No, banks cannot see your orders.** Market makers on the FXCM system don't get to see who the customer is. In fact, to the market maker, all customer orders look as if they come from one customer—FXCM. All orders, stops, and limits sit on the FXCM side and only when triggered are they sent as market orders to the banks (this also includes margin calls) that ensures that banks can't position their feeds to trigger upcoming orders unnecessarily.

(Emphasis added).

56.    Such misrepresentations continued through January 2012, where FXCM even provided a downloadable trading guide (*available at* https://web.archive.org/web/20120104211055/http://www.fxcm.com/fxcm-forex-execution.jsp) regarding the "Truth About Forex Trading" and two videos purporting to show the difference in execution methods between FXCM's NDD and dealing desk competition, labeled "most of the other guys."



 

 

57.    Similarly, in January 2013, FXCM promoted the "major benefits" provided by its

NDD                              execution                              (*available                              at*

https://web.archive.org/web/20130127222625/http://www.fxcm.com/advantages/forex-

execution/no-dealing-desk):

> Another advantage of the NDD model is that execution is transparent and fair.
> FXCM does not take a market position-eliminating a major conflict of interest.
> Dealing desk brokers, which act as market makers, may be actively trading against
> your positions. Because of this, they may manipulate your orders with re-quotes or
> in other ways. This cannot happen with our NDD forex execution. Your orders
> automatically fill from the NDD price feed, which is the best bid and best ask prices
> from all of our liquidity providers plus FXCM's small, fixed mark-up. Additionally,
> your orders are anonymous to the liquidity providers. They cannot see your stops,
> limits, or entry orders; they only see market orders coming from FXCM.

58.    FXCM continued to make such representations through January 2014, where it

continued                       to                       advertise                       (*available                       at*

14

https://web.archive.org/web/20140218145230/http://www.fxcm.com/advantages/leading-forex-broker) that NDD forex execution was the "heart" of FXCM's business.

59.     During this same timeframe, with respect to FXCM's ability to see customer's waiting orders (entry, stop, and limit), FXCM's website (*available at* https://web.archive.org/web/20130205185432/http://www.fxcm.com/advantages/forex-execution/why-execution-matters-faq/) assured its customers that this did not create any conflict of                                                                                                                 interest:



60.     In January 2015, FXCM's NDD execution continued to feature prominently on FXCM's homepage:



61.    By January 2016, FXCM's longstanding advertising to its existing and potential customers relied on the NDD and its purported conflict-free execution to sell its trading platform. In doing so, FXCM pointed to the competition provided by its NDD, which would purportedly pit market makers against one another for order flow – to "ensure prices are market-drive and fair." The benefits of using the NDD for customers included, *inter alia*: (i) "low spreads from liquidity providers"; and (ii) "potential price improvements on all order types."

# Acclaimed Execution

If you can't trust your execution, you can't be confident in your trades. That's why we offer you trading execution options to help give you an exceptional trading experience. We innovated transparency in the forex market with the competitive and market-driven No Dealing Desk (NDD) execution. And with multiple account types, you choose the execution that works best for your trading.

## For Standard Accounts—No Dealing Desk Execution

With NDD, FXCM acts as a price aggregator. We take the best available bid and best ask prices from our liquidity providers —global banks, financial institutions and other market makers— and stream those prices to your platform. This large, diverse group of liquidity providers makes this model special: The more advantageous the prices, the more order flow the provider receives. Through competition, NDD ensures prices are market-driven and fair.

- Low spreads from liquidity providers[1]
- Anonymous order execution
- No re-quotes[2]; no dealer intervention
- No restrictions on trading strategies (scalp, trade the news, use any EA)
- Potential **Price Improvements** on all order types

62.    FXCM's claims of price improvements refers to "slippage" – or the difference between the expected price of a trade and the price at which the trade is actually executed.

63.    For forex trades, slippage is more likely to occur when volatility is high, resulting in an order execution at the next available price (despite the fact that that might be different than the execution price).  FXCM advertised its pricing technology as a tool to mitigate negative slippage or even be able to capitalize on positive slippage.

# Price Improvements

With FXCM's forex execution models, you can **potentially receive price improvements on all orders** as all orders fill with FXCM's best available price.

## Our Technology: 16 Million orders with Price Improvements

**MORE THAN 16 MILLION ORDERS WITH POSITIVE SLIPPAGE FOR FXCM TRADERS (JANUARY 1, 2015 THROUGH MARCH 31, 2016*)**

With FXCM's price improvement technology, all orders can receive positive slippage, or price improvements.[1] This means you can potentially make more money if the market gaps or spikes favorably through your limit price. This is especially true in situations where the market moves fast (during weekend gaps or around news events).

**FXCM HIGHLIGHTS:**

- 78.71% of all orders had NO SLIPPAGE.
- 12.77% of all orders received positive slippage.
- 8.52% of all orders received negative slippage.
- 50.02% of all limit and limit entry orders received positive slippage.
- 39.9% of all stop and stop entry orders received negative slippage.

64.     In 2011, FXCM paid a fine of $2 million to settle a complaint by the NFA alleging that FXCM exploited positive price slippage (as discussed *infra*) and retained those gains for itself. The 2011 NFA Order is attached hereto as Exhibit D and is incorporated herein by reference.

65.     For this same activity, the CFTC ordered FXCM to pay more than $14.2 million to settle the regulator's charges against it – a $6 million civil monetary penalty and restitution of $8.2 million to its customers and former customers. The 2011 CFTC Order is attached hereto as Exhibit E and is incorporated herein by reference.

66.     Until January 2016, the identities of FXCM's NDD platform liquidity providers were not disclosed, with FXCM only disclosing a list of its liquidity providers at that point in response to an NFA disclosure requirement.  Prior to that, FXCM had made no mention of any of its market makers with the exception of a passing reference to market share captured by each in FXCM's 2010 Annual Report (*see infra* ¶ 120).  However, even then, in keeping with FXCM's

past practice throughout the entire Class Period, no mention of Effex's special relationship with FXCM was found on the website:

## FXCM Liquidity Providers

At the heart of FXCM's business is our commitment to offer clients competitive spreads on major currency pairs. We have achieved this with our No Dealing Desk Offering, which we believe is the fairest way to trade the forex market. The execution model provides traders with transparent buy and sell prices streamed from over a dozen global institutions 24 hours a day, five days a week.

**WHO ARE FXCM'S LIQUIDITY PROVIDERS?**
FXCM's liquidity providers include global banks, financial institutions, prime brokers, and other market makers. FXCM LLC currently has 17 liquidity providers: Bank of America N.A. – Barclays Bank, PLC – BNP Paribas – Nomura International, PLC – Citadel Securities LLC – Citibank N.A. – Morgan Stanley & Co., LLC – UBS AG – Deutsche Bank AG – Effex Capital, LLC – Goldman Sachs International – KCG Europe Limited – and Commerzbank AG. Liquidity providers that stream pricing through the FastMatch Electronic Communication Network include: The Royal Bank of Scotland plc – RBC Capital Markets – Société Générale Corporate & Investment Banking – Credit Suisse Group AG.

    

     

     

67.     Despite its representations to the contrary, in actuality, throughout the Class Period, FXCM had created a shadow market maker, Effex, to which it would drive business in order to secure for itself a lucrative financial kickback.

**VII.     Before Gaining Access to Any of FXCM's Trading Platforms, Each Customer Must First Accept a Client Agreement**

68.     Access to FXCM's trading products can only be obtained through the submission of an application to FXCM.

69.     In addition to inquiring about the applicant's personal information, the application also required information related to the applicant's trading and financial experience.

70.     The application process also required each prospective trader to review FXCM's client agreement which contained, *inter alia*, a risk disclosure statement and a "No Dealing Desk Disclosure." FXCM primarily relied on the electronic submission of client agreements and customer applications.  Upon information and belief, each version of the client agreement used

during the Class Period contained the same or substantially similar language regarding FXCM's NDD execution.

71.     The "No Dealing Desk Disclosure" stated, in relevant part, that FXCM did not profit when its customers lost money on a trade and rather was compensated by marking up the price it received from market makers.

72.     This claim was bolstered by corroborating statements regarding the same found on FXCM's website throughout the Class Period (*see also* ¶¶ 53-67):

a.     As of March 13, 2010, advertising that "FXCM makes an identical amount of money in the form of pip markups (which are really commissions) regardless of whether the customer made or lost money on the account," while touting an execution advantage:



(*available at* https://web.archive.org/web/20100313015135/http://www.fxcm.com/).

b.     Advertising through a page titled "Forex Trading Benefits – Advantages of Trading with FXCM":

**NO DEALING DESK EXECUTION**

- No conflict of interest between broker and trader
- No dealer intervention in trades
- Price providers (banks) do not see your stops, limits, and entry orders
- Competition reduces the potential for market manipulation by price providers

These material misrepresentations were advertised on the Company's website throughout the Class Period (*see* January 2011 archived website, *available at* https://web.archive.org/web/20110102170030/http://www.fxcm.com/forex-trading-benefits.jsp); January 2012 archived website, *available at* https://web.archive.org/web/20120103115047/http://www.fxcm.com/forex-trading-benefits.jsp);

c. As of January 2013, listing on its website the "Major Benefits" of FXCM's NDD execution:

## Major Benefits

- Competitive, market-driven prices
- Fair and transparent order execution
- Anonymous order execution (price providers cannot see your stops, limits, or entry orders)
- No conflict of interest between broker and trader
- No re-quotes[1]; no dealer intervention
- No restrictions on the strategy you use (scalp, trade the news, use any EA)

(*available at* https://web.archive.org/web/20130127222625/http://www.fxcm.com/advantages/forex-execution/no-dealing-desk);

d. Making similar assertions as of February 2014:

21

## Major Benefits

- Competitive, market-driven prices
- Anonymous order execution (price providers cannot see your stops, limits, or entry orders)
- No trading conflict of interest between broker and trader
- No re-quotes[1]; no dealer intervention
- No restrictions on the strategy you use (scalp, trade the news, use any EA)
- Potential Price Improvements on all order types

(*available at*
https://web.archive.org/web/20140220012822/http://www.fxcm.com/advantages/forex-execution/no-dealing-desk);

   e.  Similarly, as of January 2015, advertising its NDD as providing:

## Major Benefits

- Raw spreads from liquidity providers[1]
- Anonymous order execution (price providers cannot see your stops, limits, or entry orders)
- No trading conflict of interest between broker and trader
- No re-quotes[2]; no dealer intervention
- No restrictions on the strategy you use (scalp, trade the news, use any EA)
- Potential Price Improvements on all order types

(*available at*
https://web.archive.org/web/20150121054724/http://www.fxcm.com/advantages/forex-execution/no-dealing-desk/);

   f.  As of January 2016, the Company's claims of its NDD and "acclaimed execution"

remained unchanged:

## For Standard Accounts—No Dealing Desk Execution

With NDD, FXCM acts as a price aggregator. We take the best available bid and best ask prices from our liquidity providers—global banks, financial institutions and other market makers— and stream those prices to your platform. This large, diverse group of liquidity providers makes this model special: The more advantageous the prices, the more order flow the provider receives. Through competition, NDD ensures prices are market-driven and fair.

- Low spreads from liquidity providers[1]
- Anonymous order execution
- No re-quotes[2]; no dealer intervention
- No restrictions on the strategies (scalp, trade the news, use any EA)
- Potential **Price Improvements** on all order types

(*available at* https://web.archive.org/web/20160123045921/https://www.fxcm.com/advantages/forex-execution/);

      g.  Such statements remained as of January 20, 2017, just weeks before the public reveal

of the Company's misdeeds:

# Acclaimed Execution

If you can't trust your execution, you can't be confident in your trades. That's why we offer you trading execution options to help give you an exceptional trading experience. We innovated transparency in the forex market with the competitive and market-driven No Dealing Desk (NDD) execution. And with multiple account types, you choose the execution that works best for your trading.

## For Standard Accounts—No Dealing Desk Execution

With NDD, FXCM acts as a price aggregator. We take the best available bid and best ask prices from our liquidity providers—global banks, financial institutions and other market makers— and stream those prices to your platform. This large, diverse group of liquidity providers makes this model special: The more advantageous the prices, the more order flow the provider receives. Through competition, NDD ensures prices are market-driven and fair.

- Low spreads from liquidity providers[1]
- Anonymous order execution
- No re-quotes[2]; no dealer intervention
- No restrictions on trading strategies (scalp, trade the news, use any EA)
- Potential **Price Improvements** on all order types

(*available at* https://web.archive.org/web/20170120174227/https://www.fxcm.com/why-fxcm/forex-execution/).

73.     Furthermore, during the Class Period, when prompting applicants to choose a "preferred execution type" for its online application, FXCM pointed customers to NDD as "Recommended," knowing it would allow them to send business to Effex and, in turn, generate undisclosed profits for FXCM at the customer's expense.



(*available at* https://web.archive.org/web/20130404072927/http://www.fxcm.com/open-account/)

74.     Other terms of the client agreement included the claim that FXCM strictly forbade any form of manipulation of its prices, execution, or trading platforms, a false statement given that FXCM was engaged of those very same practices.

75.     Additionally, each client agreement contained FXCM's purported "Order Execution Policy."  Therein, FXCM set forth as fundamental assumptions that its platform was fully automated for pricing and order execution.

76.     Additionally, the Order Execution Policy stated unequivocally that under either the NDD execution model or Dealing Desk execution model, "FXCM strives to provide its clients the best prices."

77.     The client agreement further contained a choice of law provision, stating that its terms were governed by the laws of the State of New York, "where FXCM's principal order execution facilities are located."

78.     In applying to trade through FXCM's NDD, Plaintiff, like each member of the Class, was unknowingly exploited by FXCM by virtue of its secret arrangement with Effex.  As such, FXCM has breached its client agreement with Plaintiff and the Class.

**VIII.    FXCM Exploits its NDD Customers for its Own Financial Gain by Creating Effex as Essentially a Shell Market Maker**

79.     Beginning in 2009, Defendants Niv and Ahdout recognized the opportunity to capitalize on FXCM's NDD clients through the use of a high frequency trading algorithm.  The theory was that this computer program could completely replace or supplant many of the independent market makers on the NDD platform and allow FXCM to cash in twice on its customers (first from its mark-ups, then from its kickback) while providing a purportedly conflict-free trading platform.

80.     In furtherance of this end, FXCM hired a high frequency trader, defendant John Dittami, to a Managing Director position with FXCM.  Dittami, who commenced employment with FXCM in October 2009, would be compensated by FXCM with a base salary plus a bonus of 30% of any trading profits generated by his algorithmic trading system, with FXCM keeping the remaining 70%.

81.     In early 2010, with the trading algorithm being prepared for deployment, FXCM recognized that the use of the program might contradict with FXCM's public statements regarding

its NDD. Thereafter, FXCM determined that Dittami would spin off his algorithmic operations into his own company and operate as a purported "external" market maker on the NDD platform.

82.     This spin off occurred in late March 2010 when Dittami formed his new company – Effex. Shortly thereafter, on April 14, 2010, Dittami resigned from FXCM. Despite this resignation, however, the relationship between FXCM and Dittami would continue, with FXCM receiving 70% of any algorithmic trading profits captured by Dittami/Effex as a new market maker on the NDD platform.

83.     To memorialize their agreement, on March 1, 2010 and May 1, 2010, the Defendants entered into "services agreements" providing that Effex would make monthly payments to FXCM in an agreed-to dollar amount per million dollars of trading business volume executed by Effex. While this amount may have been couched as an order flow rebate payment, the payment was an amount agreed to by the parties to approximate 70% of Effex's profits from the NDD trades. The payment was initially fixed at $21 per million dollars of trading business volume and was later adjusted to $16 per million dollars of trading business volume in response to spreads tightening market wide.

84.     These services agreements and creation of an outside company were just window dressing by FXCM to allow it to claim to be an NDD platform while simultaneously trading against its customers through Effex.

85.     FXCM's dealings with Dittami and Effex evidence that the emerging market maker was nothing more than a shadow department of FXCM, with FXCM providing Effex a $2 million interest-free loan at its startup and its allowance to use FXCM's prime broker through a "prime of prime" account.

86.    Further, Dittami's "resignation" from FXCM was simply a formality as Dittami continued to work from FXCM's New York City offices rent free until April 2011 (a full year following his resignation) before Effex finally moved to its own office space in Jersey City, New Jersey.

87.    Most importantly, Effex continued to use the trading algorithm developed by Dittami during his time employed by FXCM and, thus, intellectual property of FXCM, to conduct its business on the NDD.  Further, for a period of time, Effex used FXCM's servers and other technology, including FXCM's email system, to operate its business.

88.    Additionally, from 2011 to 2014, two FXCM employees specifically assisted on Effex business, for which they received supplemental bonuses from FXCM, as reimbursed by Effex.  One of these employees devoted nearly 80% of his work week to Effex, even working from that company's offices from 2011 until 2014.

89.    For FXCM, the payoff was well worth it as FXCM reaped the financial benefit of its concealed relationship with Effex – receiving nearly $80 million between 2010 and 2014 in undisclosed kickback payments.

90.    Of course, each of these actions violated Forex Capital's duty of best execution and the contractual agreements entered into with Plaintiff and each member of the Class.

## IX.    FXCM Seeks to Cover its Tracks with Effex

91.    As illustrated in the CFTC Order and NFA Order, defendants spent the past several years weaving a web of misrepresentations to conceal the true relationship between FXCM and Effex.

92.    With this goal in mind, the parties entered into the May 2, 2010 services agreement whereby Effex paid FXCM for "order flow"; first, $21 per million notional volume transacted on FXCM's platforms, then adjusted downward to $16 per million in September 2011 in response to

tightening spreads in the forex market—a move to ensure Effex remained viable and that the kickbacks would continue.

93.     FXCM's own SEC filings indicated that FXCM's "order routing software ensures that payments for order flow [did] not affect the routing of orders in a manner that [was] detrimental to [FXCM's] retail customers." (FXCM 2013 Annual Report on Form 10-K). From 2010 to 2014, no other market maker besides Effex paid FXCM for order flow.  This is because, in reality, these were not order flow payments, but instead kickbacks of FXCM's cut of profits generated by the algorithm on the NDD platform by virtue of Effex's competitive advantage and market manipulation tools, as alleged herein.

94.     In fact, FXCM viewed Effex's profits as its own, using Effex's monthly profit and loss statements less thirty percent to calculate FXCM's own monthly profit and loss statement.

95.     Further, when spreads tightened and Effex's profits dropped to considerably less than $30 per million trading (of which $21 would have been FXCM's take), FXCM and Effex amended the services agreement to lower the payments per million to $16.

96.     Effex reported its profit and loss to FXCM on a weekly basis and, in turn, FXCM would "invoice" Effex for its order flow rebate.

97.     FXCM attempted to conceal these kickback payments by directing Effex to pay most of the rebates to FXCM Holdings, a non-NFA member, in an effort to curtail any probing by that regulator.

98.     In exchange for its payment of 70% of profits generated from the algorithm's use on the NDD platform, Effex would be favored in the order routing process by FXCM over other market makers.

99.    This re-writing of FXCM's order routing practices to benefit Effex resulted in a boon for both players, as Effex was anticipated to capture approximately 25% to 30% of overall trade volume on FXCM's NDD platform – a number based on the first full-scale trading session the algorithm engaged in and well above any market share Effex would have expected to capture in the forex market at large.

## X.    The Perks of Effex's Inside Relationship with FXCM

100.    In exchange for its 70% kickback to FXCM, Dittami and Effex secured benefits unheard of by any other market maker, allowing it to be the dominant player on FXCM's platform despite its small size relative to its competitors.

101.    Effex's status as FXCM's preferred market maker allowed it to win all "ties" with other market makers (where Effex and a different market maker provided the same quote for a trade) and provided it access to a real-time view of price quotations offered by other market makers, thus allowing it a last look and the ability to at least match that offer – winning by virtue of its default tiebreaker.

102.    Furthermore, FXCM added smaller markups to Effex prices than to other market makers, manipulating the process to ensure that Effex had an advantage over its competition.

103.    Additionally, Effex, with the knowledge and blessing of FXCM and the Management Defendants, instituted an asymmetrical price slippage practice that deprived FXCM's customers of positive price improvements while giving customers negative price slippage.

104.    Slippage is a regular occurrence in forex transactions where an order is filled at a price that is different than the requested price.  This happens because of an imbalance between buyers and sellers in the OTC market.

105.    Positive price slippage occurs when there are sellers in the market willing to sell their commodity at a price lower than that originally requested.  In this instance, the buyer would enjoy the positive effect of getting a better price than that at which he originally requested.

106.    In the event of negative slippage, an order is submitted and the best available buy price being offered at the market is above the requested price.  In this instance, the slippage is to the detriment of the buyer who has now received a different, higher price than that originally requested.

107.    With respect to Effex and FXCM, instead of passing along the rate improvement to FXCM's retail customers and allowing for the positive price improvement, FXCM froze the transaction at the worse rate to ensure a deal with Effex, using the Hold Timer and "previous quote" practice to manipulate the forex market.

108.    Effex maintained a stranglehold over the FXCM platform through its use of a Hold Timer, as approved of and permitted by FXCM and defendants Niv and Ahdout, that enabled Effex to execute a trade at the start or end of a hold timer period, depending on which was better for Effex (and, in turn, FXCM).  In using this "last look" Effex would impose a hold period between the receipt of a customer order and the acceptance or rejection of the order.  During this hold period – which was milliseconds in duration – Effex would compare the price of the customer's order at the start of the Hold Timer against the prevailing price at the end of the Hold Timer.  In cases where the price at the end of the Hold Timer had moved against Effex, and in favor of the customer, Effex would reject the trade.  On the other hand, if the price had moved in favor of Effex and against the customer, Effex would execute the trade and give the customer negative price slippage. This allowed Effex to essentially freeze any transaction while it determined to accept to reject a trade, thus manipulating the market to its and FXCM's advantage.

109.     For example, assume an FXCM customer was seeking to trade the EUR/USD currency pair at the rate of 1 Euro to $1.3650 USD.  If the FXCM platform were actually fair, upon submitting this request to the market, each market maker on the platform would determine if they would like to enter into that counter transaction and the first market maker to accept the terms would execute the trade through FXCM's offsetting transactions.  However, when using the Hold Timer, Effex was able to stake a claim to an incoming trade for a set period of time and monitor the market at large in order to execute a trade on terms most favorable to it and detrimental to the customer.  Using the same example above, if the buy price on the EUR/USD pair moved during the hold period to $1.3640 (or 10 pips), Effex would then reject the trade, avoiding a price improvement for the customer.  However, if the buy price on this pair moved instead to $1.3660 during the hold period, Effex would execute the trade (since it still maintained its exclusivity over it), capitalize on the favorable improvement from its end, and pass along negative slippage to the customer.

110.     In other circumstances, Effex exploited the Hold Timer further, holding market orders for a preset period and then executing the order at a price beneficial to Effex and to the detriment of FXCM's customers.  Through this practice, Effex's system would hold the order, review the prices that existed at the beginning and end of the hold timer, and then fill the order at the price that was more favorable to Effex.

111.     Under this egregious practice, a hypothetical buy order for EUR/USD would come in from a retail customer at $1.3650.  Effex would then institute the holder timer and monitor the larger market.  Assuming a going rate of $1.3650 at the beginning of the holder timer changed to $1.3640 by the end of the period (and, thus should have resulted in positive slippage for the customer), Effex would still execute the transaction at $1.3650.

112.    The Hold Timer was maintained by those FXCM employees assigned to provide trade support to Effex, as these FXCM agents adjusted the timer to Effex's benefit.

113.    Effex itself was able to adjust the Hold Timer through the integration of the settings into its own proprietary trading application, allowing the market maker the ability to turn the hold timer off and on and to adjust the duration when needed to allow for a longer survey of the larger market.

114.    Finally, Effex also used a "previous quote" practice.  Here, FXCM shared trade data with Effex, including the price that would trigger the execution of a customer's order (the "Tagged Price").  Effex then used the information to decide whether to execute the trade at its previously-quoted bid (or offer) or at the Tagged Price, choosing the price that was more favorable to Effex and which deprived the customer of favorable price movement.  In doing so, Effex was using its inside track and knowledge of a customer's least favorable acceptable trade quote to ensure that it was getting the most favorable end of the bargain.

115.    FXCM constantly monitored Effex's trading and percentage of volume captured, with Company personnel providing regular updates to the Management Defendants on Effex's daily dealing activity.

116.    Spurred by its competitive advantage, Effex routinely captured over 50% of FXCM's daily order flow and, at one time, captured nearly 80%.

**XI.    FXCM Lies to its Customers about its Relationship with Effex**

117.    To the investing public, FXCM held itself out as an above-board trading platform; a middle man through which a forex investor could be connected with some of the largest liquidity providers in the world.

118.    To lure customers in, FXCM touted the transparency of its NDD platform which made its spreads "some of the lowest in the industry."

119.    As of December 2016, FXCM, through its website, reiterated its commitment to

transparency on its NDD platform, stating, *inter alia*:

- "At the heart of FXCM's business is our commitment to offer clients competitive spreads on major currency pairs. We have achieved this with our No Dealing Desk Offering, which we believe is the fairest way to trade the forex market. The execution model provides traders with transparent buy and sell prices streamed from over a dozen global institutions 24 hours a day, five days a week."

- "Each liquidity provider streams through a direct feed of executable buy and sell prices to FXCM. FXCM's No Dealing Desk Price Engine selects the best buy price and the best sell price, which result in the best available spread. There is no markup added to FXCM's Standard No Dealing Desk account type, making our spreads transparent and some of the lowest in the industry."

- "In addition to best price, liquidity providers are also ranked by their executable prices, order rejection rate, spreads, quoting prices, and latency. Those that provide the best pricing and execution will receive an increase in orders, whereby poor performers will be moved to the end of the line or completely removed from the platform. By holding our liquidity providers to such high standards, we are able to provide the best possible customer experience."

- "When a trader places an order through FXCM's Straight-Through Processing system, an exact matching order is sent from FXCM to the liquidity provider that is providing the best price. For example, a buy order in the example above would go to liquidity provider #2. To the liquidity provider, all orders appear as Market Orders from FXCM and contain no information about the trader. Since your stops, limits, and your entry orders are invisible to these price providers, we create an environment free of price manipulation. When we combine this with no re-quote trading you have the opportunity to confidently trade all market conditions, even during key news events."

- "With NDD, FXCM acts as a price aggregator. We take the best available bid and best ask prices from our liquidity providers—global banks, financial institutions and other market makers— and stream those prices to your platform. This large, diverse group of liquidity providers makes this model special: The more advantageous the prices, the more order flow the provider receives. Through competition, NDD ensures prices are market-driven and fair."[1]

120.    To this point, and unbeknownst to FXCM's user base or investors, it had been

common practice for FXCM to "hide the ball" with respect to the liquidity providers on its NDD

---

[1] This, in fact, was FXCM's main selling point throughout the Class Period.  *See supra*, ¶ 73.

platform.  For example, in its 2010 Annual Report, released to investors in 2011, for the first time and only time since, FXCM included a graphic showing the percentage of volume of each liquidity provider on the NDD platform:



121.    The numbers were largely consistent with the largest players in the forex market at that point with the exception of the nearly 36% of volume transacted with "Citi-Prime Broker (All Others)."

122.    Of course, this figure was mostly, if not fully, comprised of transactions made with Effex and the trading algorithm through its "prime of prime" relationship with FXCM. The 36% of trades executed by Effex was a huge figure considering that the Effex trading algorithm was not used in a full-scale trading session until April 2010.

123.    Throughout the Class Period, FXCM further deliberately misled the public through postings by its employee, Jason Rogers, a "brand ambassador" on the forums of the Forex Factory website, to deflect on any discussion of Effex or FXCM's shady business practices.

124.    For example, in response to an anonymous post in September 2012 FXCM's Brand Ambassador invoked FXCM's ownership of Lucid Markets while also claiming the presence of Non-Disclosure Agreements as the reason FXCM did not disclose the names of its liquidity providers – an ironic statement given that he subsequently confirmed Effex as a market maker and directed readers to FXCM's 2010 Annual Report for a market maker percentage breakdown:



125.    Such claims by the FXCM employee have since been proven to be entirely false and the anonymous post, true as: (i) Effex was a small firm and the largest liquidity provider to the NDD platform; (ii) FXCM effectively owned Effex through its 70% stake in that company's profits; (iii) Effex was developed by FXCM employees with FXCM's management's oversight, for the purpose of acting as a counterparty to FXCM clients; and (iv) Effex enjoyed its status atop the liquidity pool pyramid for the NDD platform, allowing it to pick and choose the order flow that would be most beneficial to it through both its real-time access to FXCM's other market makers' quotes and its tie-breaking preference.

126.    Instead, through its concealment of this relationship, FXCM continued to reap the financial benefit – receiving nearly $80 million in kickbacks between 2010 and 2014, with continued unknown payments until the Regulator Orders issued.

127.    Further, upon information and belief, FXCM's senior executives, including defendants Niv and Ahdout, approved of Effex's use of execution practices that denied customers the benefit of positive price improvement.   These practices were similar in nature to the

asymmetrical price slippage practices alleged in the NFA's and CFTC's 2011 disciplinary cases against FXCM.

128.    As such, any claim of "positive slippage" were false as related to trades executed by Effex, which engaged in execution practices that continued to deprive FXCM's customers of positive price improvements, while giving customers negative price slippage.

## XII.    FXCM Lies to Federal Regulators in an Effort to Continue its Charade

129.    In connection with a 2013 investigation of FXCM by the NFA, NFA compliance staff met with Company executives on October 24, 2013 in Chicago.  In response to the NFA's questions about FXCM's relationship with Effex, defendant Niv omitted to mention any details concerning FXCM's relationship with Effex and its principal, defendant Dittami.  Instead, Niv misrepresented that he had a prior working relationship from when Dittami was a trader employed by other liquidity providers.

130.    FXCM's Compliance Department similarly made false statements in October 2014 to the NFA, stating in an email, "FXCM LLC does not have any direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients."  When asked to clarify this statement in March 2014, an FXCM Compliance representative again stated, "[t]o my knowledge, there are no present or past owners, principals, [associated persons], or employees of affiliates of FXCM LLC that have direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients on our No Dealing Desk Model."

131.    These statements were false, as both Niv and FXCM's compliance officer knew that Dittami was a former executive of FXCM and the principal owner of Effex, the primary provider of liquidity to retail clients on FXCM's NDD platform.

132.    When clarification was again sought by the NFA in April 2014, FXCM's compliance function again sought to obfuscate FXCM's relationship with Dittami, saying that he

38

"served as a consultant for FXCM from October 2009 through April 2010" during which time he "worked primarily on software coding."   In doing so, FXCM deliberately misled the NFA's investigators as: (i) Dittami was not a consultant for FXCM, but rather an executive employed pursuant to an employment agreement; and (ii) Dittami's work was deceptively characterized as "software coding" when in actuality he was developing the entire trading algorithm that would act as the basis for the Effex spin-off.

## XIII.    FXCM Shutters its United States Business in the Wake of Regulator Sanctions

133.   On February 6, 2017, the NFA's Business Conduct Committee issued a complaint against Forex Capital, Ahdout, Niv and Forex Capital CEO Ornit Niv alleging, *inter alia*, that FXCM's execution model was corrupted by FXCM's relationship with Effex (the "NFA Complaint"). A copy of the NFA Complaint is attached hereto as Exhibit B, and is incorporated herein by reference.

134.   On the same day the NFA Complaint was filed, the NFA Order was entered by the Business Conduct Committee, accepting FXCM, William Ahdout, Dror Niv, and Ornit Niv's offer of settlement.   Therein, the Business Conduct Committee made a factual finding that each committed the violations alleged against them in the complaint and ordered:

      i.     FXCM shall be withdrawn from NFA membership, within fifteen (15) days of the effective date of [the] Decision accepting [the] Offer, unless such period is extended by the BCC for good cause.  Thereafter, FXCM shall not reapply for NFA membership or principal status or act as a principal of an NFA Member at any time in the future; and

     ii.     Ahdout, Niv and Ornit Niv shall be withdrawn from NFA associate membership and principal status on or before fifteen (15) days after the effective date of a Decision accepting this Offer unless such period is extended by the BCC for good cause.  Thereafter, Ahdout, Niv and Ornit Niv shall not apply for NFA membership, reapply for NFA associate membership or principal status, or act as a principal of an NFA Member at any time in the future.

135.   Similarly, the CFTC entered the CFTC Order on February 6, 2017.

136.    Therein, the CFTC made similar findings of fact and found that, during the relevant time period of September 4, 2009 through at least 2014, Forex Capital, FXCM holdings, Niv, and Ahdout violated Sections 4b(a)(2), 7 U.S.C. § 6b(a)(2), and Regulation 5.2(b), 17 C.F.R § 5.2(b) of the CEA, with Forex Capital, FXCM Holdings, and Niv also violating Section 9(a)(4) of the CEA, 7 U.S.C. § 13(a)(4).

137.    In connection with their acceptance of the offer of settlement from the CFTC, an ordered entered ordering, among other provisions:

    i.  Respondents would immediately cease and desist from violating the CEA;

    ii.  Responds would pay, jointly and severally, a civil penalty of $7,000,000 to the CFTC;

    iii.  FXCM would not accept any new customers following the entry of the Order;

    iv.  FXCM, Niv, and Ahdout shall, within thirty days of the entry of the order, withdraw from registration with the CFTC in all capacities;

    v.  FXCM, Niv, and Ahdout shall never, directly or indirectly, apply for registration or claim exemption from registration with the CFTC in any capacity, or engage in any activity requiring such registration or exemption; or act as a principal, agent or any other officer or employee of any person registered, required to be registered, or exempted from registration with the CFTC.

138.    The CFTC also issued a press release outlining its findings and the settlement agreement:

> Washington, DC – The U.S. Commodity Futures Trading Commission (CFTC) today issued an Order filing and settling charges against Forex Capital Markets, LLC (FXCM) , its parent company, FXCM Holdings, LLC (FXCM Holdings), and two founding partners, Dror ("Drew") Niv, and William Ahdout, who were, respectively, Chief Executive Officer of FXCM and Managing Director of FXCM, (collectively, Respondents). FXCM's principal place of business is New York, New York; Niv resides in Connecticut; and Ahdout resides in New York.
>
> The CFTC Order finds that, between September 4, 2009 though at least 2014 (the Relevant Period), FXCM engaged in false and misleading solicitations of FXCM's retail foreign exchange (forex) customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk"

platform had no conflicts of interest with its customers. The Order finds FXCM, FXCM Holdings, and Niv responsible for FXCM making false statements to the National Futures Association (NFA) about its relationship with the market maker.

The Order requires Respondents jointly and severally to pay a $7 million civil monetary penalty and to cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, as charged. FXCM, Niv, and Ahdout agree to withdraw from CFTC registration; never to seek to register with the CFTC; and never to act in any capacity requiring registration or exemption from registration, or act as a principal, agent, officer, or employee of any person that is registered, required to be registered, or exempted from registration with the CFTC.

"The CFTC Is Committed to Protecting Customers from Harm in the Markets It Regulates"

"Full and truthful disclosure to customers and honest discourse with self-regulatory organizations such as NFA are vital to the integrity and oversight of our markets," said Gretchen L. Lowe, Principal Deputy Director and Chief Counsel of the CFTC's Division of Enforcement. "Today's action's demonstrates that the CFTC is committed to protecting customers from harm in the markets it regulates."

FXCM is registered with the CFTC as a Futures Commission Merchant and Retail Foreign Exchange Dealer. FXCM has been providing retail customers with access to over-the-counter forex markets through a proprietary technology platform and has acted as counterparty in transactions with its retail customers in which customers can buy one currency and simultaneously sell another. Both Niv and Ahdout were CFTC registrants during the relevant period.

FXCM, under Niv's and Ahdout's direction and control, misrepresented to its retail forex customers that when they traded forex on FXCM's No Dealing Desk platform, FXCM would have no conflict of interest, the Order finds. In addition, according to FXCM's marketing campaign, retail customers' profits or losses would have no impact on FXCM's bottom line, because FXCM's role in the customers' trades was merely that of a credit intermediary, the Order finds. FXCM further represented that the risk would be borne by banks and other independent "market makers" that provided liquidity to the platform, according to the Order.

FXCM's Undisclosed Interest

Contrary to these representations, the Order finds, FXCM had an undisclosed interest in the market maker that consistently "won" the largest share of FXCM's trading volume – and thus was taking positions opposite FXCM's retail customers. FXCM, the Order finds, formulated a plan in 2009 to create an algorithmic trading system, using an FXCM computer program that could make markets to FXCM's customers, and thereby either replace or compete with the independent market makers on FXCM's "No Dealing Desk" platform. Although FXCM eventually

spun off the algorithmic trading system as a new company, in actuality FXCM remained closely aligned with FXCM, according to the Order. This market maker received special trading privileges, benefitted from a no-interest loan provided by FXCM, worked out of FXCM's offices, and used FXCM employees to conduct its business, the Order further finds.

The Order finds that FXCM and the market maker agreed that the market maker would rebate to FXCM approximately 70 percent of its revenue from trading on FXCM's retail forex platform. In total, through monthly payments from 2010 through 2014, FXCM rebated to FXCM approximately $77 million of the revenue it achieved. However, FXCM did not disclose to customers, among other things, that this company – FXCM's principal market maker – was a startup firm spun off from FXCM, the Order further finds.

False Statements to the NFA

The Order also finds that FXCM willfully made false statements to NFA in order to conceal FXCM's role in the creation of its principal market maker as well as the fact that the market maker's owner had been an FXCM employee and managing director. The Order finds that during a meeting between NFA compliance staff and FXCM executives, Niv omitted to mention to NFA the details of FXCM's relationship with the market maker.

The Order holds Niv and Ahdout liable for FXCM's fraud violations as "controlling persons" who were responsible, directly or indirectly, for FXCM's violations. Niv is also held liable for FXCM's false statements to NFA as a controlling person who was responsible directly or indirectly for those violations. FXCM Holdings is held liable for FXCM's fraud and false statement violations as principal of FXCM, the Order also finds.

The CFTC thanks NFA for its assistance in this matter.

139.    FXCM issued a press release of its own on February 6, 2017, announcing the settlements with the NFA and CFTC, as well as its withdrawal from doing business in the U.S. market (per the CFTC's requirement) and its entry into a non-binding letter of intent with GAIN Capital Holdings, Inc. ("GAIN") pursuant to which GAIN would purchase FXCM's U.S.-domiciled customer accounts.

140.    On February 7, 2017, FXCM entered into an Asset Purchase Agreement with GAIN whereby GAIN would receive all U.S.-domiciled customer accounts and, in turn, would pay $500

for each transferred client account for which the transferred account executed at least one new trade during the first half of a 153 day period following the close of the transfer, and $250 for each transferred account that executed at least one new trade during the second half of this period. The disposition of these assets was completed on February 24, 2017.

141.    On February 21, 2017, defendants Niv and Ahdout resigned from their positions as members of the FXCM Board of Directors and defendant Niv as Chief Executive Officer. Also on this day, FXCM announced its intention to change its name to Global Brokerage Inc., effective February 27, 2017.

## FXCM'S FIDUCIARY DUTIES AND DUTY OF BEST EXECUTION

142.    Under New York law, a fiduciary relationship arises where one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party and the defendant was under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.

143.    The duty of best execution predates any federal securities or commodities laws, with roots in the common law agency obligations of undivided loyalty to act exclusively in the principal's best interest and to use reasonable care to transact the agent's business.

144.    FXCM's duty of loyalty to Plaintiff and the Class required FXCM to place the interests of Class members over the interests of any of the Defendants. Because Plaintiff and the Class sought their own economic gain by engaging with FXCM for the purposes of conducting conflict-free forex trades, the purpose of the agency was to help Plaintiff and the Class achieve that objective.

145.    Delivering best execution is fundamental to maintaining the integrity of the market.

146.    FXCM's duty of loyalty and reasonable care in achieving best execution required FXCM to seek the most favorable terms for Class members' forex trades, including pairing each customer with the market maker that provided the best terms in a fair and transparent environment.

147.    In fact, FXCM itself touted its "acclaimed execution" to customers on its website.

148.    Delivering best execution is fundamental to market integrity and to the delivery of good outcomes for investors who rely on agents to act in their best interests.  Pursuant to best execution, an electronic communications network like FXCM, which was operating as a *de facto* marketplace for its clients and liquidity providers, are required to use reasonable diligence to ascertain the best trading partner so that the resultant terms to its customers are as favorable as possible, particularly in the absence of any conflict disclosure to the contrary.  Electronic communications networks, such as FXCM, are not permitted to allow kickbacks to interfere with their duty of best execution.

149.    Rather than abide by its duty, FXCM and the other defendants put their own interests ahead of those of FXCM's customers, misrepresenting the nature of the NDD platform while manipulating trade activity to ensure maximum profits to Effex and FXCM, to the detriment of FXCM's customers.

## CLASS ACTION ALLEGATIONS

150.    Pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and on behalf of the following "Class":

> All persons who, between March 10, 2010 and February 6, 2017 entered into a forex transaction through FXCM's "No Dealing Desk" platform.

151.    Specifically excluded from the Class are Defendants, the officers, directors, or employees of any Defendant, any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, and any person acting on their

behalf.  Also excluded from the Class is any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this Action.

152.  *Ascertainability*.  The Class is readily ascertainable through records maintained in the regular course of business by Defendants.

153.  *Numerosity*.  The members of the Class are so numerous that their individual joinder is impracticable.  As of December 31, 2016, FXCM had over 178,000 active retail customer accounts globally, with approximately 40,000 active retail accounts in the United States transferring from FXCM to Gain Capital following the FXCM's forced withdrawal from the U.S. market.  Each of these account holders has been damaged by FXCM's conduct as alleged herein.

154.  *Typicality*.  All members of the Class have been subject to and affected by the same conduct, misrepresentations, omissions, and manipulation by Defendants.  Plaintiff and members of the Class sustained damages arising out of Defendants' course of conduct in violation of the CEA and common law, as alleged herein.  The damages and injuries of each member of the Class was directly caused by the Defendants' wrongful conduct.

155.  *Existence of Common Questions of Law and Fact*. There are questions of law and fact common to the members of the Class, including, but not limited to:

    a.  Whether statements made by Defendants as part of their promise to provide, and assertions that they do provide, best execution of their clients' orders, discussed herein are true, or are reasonably likely to deceive, given the omissions of material fact described above;

    b.  Whether federal and common laws were violated by Defendants' acts as alleged herein;

    c.  Whether Plaintiff and the Class are entitled to damages; and

    d.  Whether Plaintiff and the class are entitled to restitution, other equitable relief, and/or other relief as may be proper.

156.    *Adequacy.*  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained counsel experienced in complex consumer class action litigation and intends to prosecute this action vigorously.  Plaintiff has no interests adverse or antagonistic to those of the Class.

157.    *Predominance and Superiority.*  Questions of law and fact common to the Class predominate over any questions affecting only individual members.  Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy as the prosecution of separate actions by individual members of the Class would impose a heavy burden on the Courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class members.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.  Absence a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

158.    The statute of limitations relating to any claims for relief alleged herein were tolled because a fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.  Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of due diligence prior to the time there were public disclosures of the relationship between FXCM and Effex.  Plaintiff thus asserts the tolling of the applicable statute of limitations affecting the rights of the claims of relief asserted by Plaintiff.  Defendants are also equitably estopped from asserting that any otherwise applicable limitations period has run.

159.    Active acts of concealment by Defendants to conceal their violations of law from Plaintiff and the Class include, but not are not limited to: (i) FXCM's consistent assertions that the NDD platform was conflict-free; (ii) FXCM's regular statements that it did not profit from its customers' losses; and (iii) knowingly submitting and/or making false or misleading statements to regulatory bodies, including the NFA and CFTC.

160.    Many, if not all of these affirmative acts of concealment were inherently self-concealing.  Further, the manipulation of FXCM's trade routing system required that it remain concealed from regulators and the public in order to ensure its success over an extended period of time.

161.    Further evidencing the self-concealing nature of the manipulation alleged herein is FXCM's forced discontinuance of its U.S.-based business following the orders of the NFA and CFTC – orders that entered on the same date as the public disclosure of each regulator's complaint against FXCM.

**COUNT ONE**
**Breach of Contract**
**Against Forex Capital**

162.    Plaintiff incorporates by reference and reallege each and every paragraph alleged above as though fully alleged herein.

163.    Plaintiff and each member of the Class entered into a written client agreement with Forex Capital that governed the terms of their relationship with FXCM.

164.    Each client agreement contained Forex Capital's purported "Order Execution Policy."  Therein, Forex Capital set forth as fundamental assumptions that its platform was fully automated for pricing and order execution.

165.    Additionally, the policy stated unequivocally that under either the NDD execution model or Dealing Desk execution model, "[Forex Capital] strives to provide its clients the best prices."

166.    Further, the Client Agreement included a "No Dealing Desk Disclosure."  This disclosure stated, in relevant part, that Forex Capital did not profit when its customers lost money on a trade and rather was compensated by marking up the price it received from market makers.

167.    As alleged herein, Forex Capital committed a material breach of each of these statements, as the platform and order execution was not fully automated, with Effex maintaining as competitive advantage over each of the other market makers providing liquidity to Forex Capital customers.

168.    Further, Forex Capital did not "strive to provide its clients the best prices."  Instead, it worked hand-in-hand with Effex to create and implement the tools of market manipulation that would ensure its customers would be saddled with negative slippage while denying them any positive price improvements.

169.    Finally, Forex Capital and its affiliates very clearly did profit throughout the class period from its customers' losses on trades through its 70% take of Effex's profits.  As a market maker, Effex's profits were entirely contingent on making a "good deal" – the inverse of which is an FXCM customer making a "bad deal" that loses money.

170.    Plaintiff and the Class have each performed according to the terms of their client agreement and have been harmed by Forex Capital's breach thereof, in an amount to be determined at trial.

## COUNT TWO
## Breach of Implied Covenant of Good Faith and Fair Dealing
## Against Forex Capital

171.    Plaintiff incorporates by reference and reallege each and every paragraph alleged above as though fully alleged herein.

172.    Plaintiff and each member of the Class entered into binding and enforceable contracts with Forex Capital in the form of their client agreements and application to trade on Forex Capital's platforms.

173.    Each of the contracts includes an implied covenant of good faith and fair dealing, requiring each contracting party to act in good faith and deal fairly with the other, and not to take any action which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

174.    Defendant Forex Capital breached its duty and, without reasonable basis and with improper motive, acted in bad faith by, among other things: (i) misrepresenting FXCM's relationship with Effex; (ii) assisting in Effex's manipulation of the forex market through its use of those tools discussed herein; (iii) profiting from its clients' trade losses despite purportedly providing "No Dealing Desk" execution.

175.    As a direct and proximate cause of these breaches of the implied covenant of good faith and fair dealing and of Defendants Forex Capital's frustration of the purposes of these contracts, Plaintiff and similarly situated members of the Class have each been damaged as alleged herein in an amount to be proven at trial.

## COUNT THREE
### Breach of Fiduciary Duties and the Duty of Best Execution
### Against Forex Capital

176.    Plaintiff incorporates by reference and reallege each and every paragraph alleged above as though fully alleged herein.

177.    Forex Capital owed fiduciary duties to Plaintiff and the Class, including the duties of best execution.

178.    Pursuant to its duty of best execution, Forex Capital was required to provide its customers with conflict-free execution.  By using the order-routing policies and practices described herein, Forex Capital breached its fiduciary duty owed to Plaintiff and the Class.

179.    Forex Capital and its affiliated entities, including defendants FXCM Inc. and FXCM Holdings, earned significant and wrongful monies and profits from its material and opportunistic breaches that have also caused the orders made by Plaintiff and the Class to be executed in a manner that did not fulfill best execution and on a conflicted marketplace.  Forex Capital's customers have been damaged thereby in an amount to be determined at trial.

**COUNT FOUR**
**Aiding and Abetting Breach of Fiduciary Duties and the Duty of Best Execution**
**Against FXCM Inc., FXCM Holdings, the Management Defendants, and the Effex**
**Defendants**

180.    Plaintiff incorporates by reference and reallege each and every paragraph alleged above as though fully alleged herein.

181.    FXCM Inc., FXCM Holdings, the Management Defendants, and the Effex Defendants have acted and are acting with knowledge of, or with reckless disregard to, the fact that Forex Capital breached its fiduciary duties to its customers, and have participated in such breaches of fiduciary duties.

182.    Moreover, FXCM Inc., FXCM Holdings, the Management Defendants, and the Effex Defendants knowingly aided and abetted the Forex Capital's wrongdoing alleged herein.  In so doing, they rendered substantial assistance in order to effectuate Forex Capital's plan to misrepresent its NDD platform and profit from its misrepresentation.

183.    As a result of the unlawful actions of FXCM Inc., FXCM Holdings, the Management Defendants, and the Effex Defendants, Plaintiff and the other members of the Class have been irreparably harmed in that they did not receive the benefit of a conflict-free trading experience with Forex Capital, nor best execution.

## COUNT FIVE
### Negligence
### Against FXCM Inc., FXCM Holdings, Forex Capital, Niv and Ahdout

184.    Plaintiff incorporates by reference and reallege each and every paragraph alleged above as though fully alleged herein.

185.    To the extent required, this claim is pled in the alternative to Plaintiff's Count Six and Seven for relief, as set forth herein, under FED. R. CIV. P. 8(d).

186.    Defendants FXCM Inc., FXCM Holdings, Forex Capital, Niv and Ahdout, by virtue of their superior knowledge, judgment, skill, and experience in rendering forex execution services, and the standard of care existing in the foreign exchange industry as set forth, among other things, by the rules of the CFTC, NFA, New York, and Federal law, owed Plaintiff and the Class a duty of fair dealing and due care.

187.    Defendants FXCM Inc., FXCM Holdings, Forex Capital, Niv and Ahdout had a duty to offer to FXCM's customers best execution on their transactions and to execute those trades with reasonable care.

188.    Defendants FXCM Inc., FXCM Holdings, Forex Capital, Niv and Ahdout failed to exercise that reasonable care when they allowed and enabled Effex's exploitation of FXCM's trading platforms for each's financial gain.

189.    Defendants FXCM Inc., FXCM Holdings, Forex Capital, Niv and Ahdout continued to allow Effex's manipulative actions despite the obvious red flags raised both internally by FXCM's compliance functions and externally, from regulator inquiries.

190.    Yet, through it all, Defendants FXCM Inc., FXCM Holdings, Forex Capital, Niv and Ahdout continued to misrepresent FXCM's relationship with Effex while purportedly holding its NDD execution out as free from conflict.

191.    Defendants FXCM Inc., FXCM Holdings, Forex Capital, Niv and Ahdout committed acts or omissions that a reasonable, prudent person knows is likely to result in injury to another, including Plaintiff and the Class.  Those acts include lying to regulators and providing Effex with a competitive advantage over other market makers that negatively impacted customer transactions.

192.    As the employer of the Management Defendants, Defendants FXCM Inc., FXCM Holdings, Forex Capital are liable for the actions of its agents and employees, including Niv and Ahdout.

193.    As a direct and proximate cause of Defendants FXCM Inc., FXCM Holdings, Forex Capital, Niv, and Ahdout's negligence, Plaintiff and similarly situated members of the Class have each been damaged as alleged herein in an amount to be proven at trial.

### COUNT SIX
### Unjust Enrichment
### Against FXCM Inc., FXCM Holdings, and Forex Capital

194.    Plaintiff incorporates by reference and reallege each and every paragraph alleged above as though fully alleged herein.

195.    To the extent required, this claim is pled in the alternative to Plaintiff's Count Five for relief, as set forth herein, under FED. R. CIV. P. 8(d).

196.     Forex Capital owed a duty of best execution to Plaintiff and the Class. Notwithstanding its duties, Forex Capital utilized a conflicted trade routing practice that was not in its customers' best interests.  In exchange for its provision of otherwise-unavailable information to Effex and the benefits described herein, FXCM Inc., through its ownership in FXCM Holdings and Forex Capital, received 70% of Effex's ill-gotten profits – all at the expense of its customers.

197.     As the intended and expected result of its conscious wrongdoing as set forth in this Complaint, FXCM profited and benefits from its improper relationship with Effex and order routing practices.

198.     By its improper and wrongful conduct described herein, FXCM was unjustly enriched at the expense of Plaintiff and the members of the Class.

199.     It would be inequitable for FXCM to retain the profits, benefits, and other compensation it obtained through its wrongful acts, including the commissions and kickbacks obtained in connection with routing the orders at issue. Thus, a constructive trust should be imposed on all monies wrongfully obtained by FXCM. Plaintiff and the Class are entitled in equity to seek restitution of these wrongful profits, revenues, and benefits to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy FXCM's unjust enrichment.

**COUNT SEVEN**
**For Manipulation in Violation of the Commodities Exchange Act**
**7 U.S.C. § 1, _et seq_. and Regulation 5.2(b)**
**Against Forex Capital**

200.     Plaintiff incorporates by reference and reallege each and every paragraph alleged above as though fully alleged herein.

201.     Sections 4b(a)(2)(A) and (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A) and (C) provide, in relevant part, that it is unlawful for any person, in or in connection with any order to make, or

the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person: (A) to cheat or defraud or attempt to cheat or defraud the other person; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in connection with such contract.

202.    Pursuant to Section 2(c)(2)(C)(iv) of the CEA, 7 U.S.C. § 2(c)(2)(C)(iv), Section 4b of the CEA applies to any retail forex agreement, contract, or transaction described in Section 2(c)(2)(C)(i) of the CEA, 7 U.S.C. § 2(c)(2)(C)(i), as if the agreement, contract, or transaction were a contract of sale of a commodity for future delivery.

203.    Regulations 5.2(b)(1) and (3), 17 C.F.R. §§ 5.2(b)(1) and (3) provide, in pertinent part, that it shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (1) to cheat or defraud or attempt to cheat or defraud any person; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

204.    **Misrepresentation or Failure to Disclose Certain Information**.  As described herein, FXCM made misrepresentations to, and omitted materials facts from, Plaintiff and all FXCM customers.  In particularly, FXCM misrepresented to its customers that it was merely acting as an agent or intermediary between retail customers and market makers on the No Dealing Desk and that it did not take positions opposite retail customers.  Instead, as alleged, FXCM did benefit from losses sustained by customers through its substantial interest in Effex – its primary market maker.  This undisclosed conflict began in 2010 and remained hidden from FXCM customers until February 2017.

205.    **FXCM's Misrepresentations and Omissions Were Material in Nature**.  Each of FXCM's misrepresentations or omissions alleged herein were material facts that a reasonable

investor would consider important in making a decision to trade through FXCM. As alleged herein, in evaluating which forex trading platform would provide the best prices and execution, a reasonable customer would rely on FXCM's promises that its incentives were aligned with its customers' experience and that it had no conflicts of interest.

206. **FXCM Acted with Scienter**. Scienter is established by showing either knowledge of falsity or reckless disregard for the truth or falsity of one's statements. As alleged herein, FXCM personnel had full knowledge of the representations that the firm was making to its customers about the NDD platform, as well as the facts about Effex and Dittami's relationships with FXCM. Accordingly, FXCM knowingly or recklessly misrepresented and failed to disclose to retail customers the true nature of its relationship with Effex.

207. As a direct result of FXCM's unlawful conduct, Plaintiff and members have the Class have suffered actual damages and injury in fact due to the artificial prices and transactions executed on an unfair trading platform, to which they would not have been subject but for the unlawful conduct of the Defendants alleged herein.

208. Plaintiff and members of the Class who purchased or sold forex through FXCM's NDD platform during the Class period were injured and are each entitled to their actual damages for the violations of the CEA alleged herein.

**COUNT EIGHT**
**For Principal-Agent Liability in Violation of the Commodities Exchange Act**
**7 U.S.C. § 1, *et seq.***
**Against FXCM Inc., FXCM Holdings, and Forex Capital**

209. Plaintiff incorporates by reference and reallege each and every paragraph alleged above as though fully alleged herein.

210. Pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), "[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association,

partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust." Under this section, a principal is strictly liable for the violations of its officials acting for it within the scope of their employment or office.

211.    All of the illegal actions described above were committed by employees and officials working for FXCM, and all of their actions and omissions were within the scope of their employment or office when their conduct violated Section 4b of the CEA. FXCM Inc., FXCM Holdings, and Forex Capital are therefore liable for its agents' violations of those provisions.

212.    FXCM Holdings is strictly liable as principal for Forex Capital's violations of the CEA because FXCM Holdings was the parent company of Forex Capital, their interests and business activities were sufficiently intertwined, and FXCM Holdings directly controlled the operations of FXCM as they related to the violations.

213.    Likewise, FXCM Inc. is strictly liable as sole managing member of FXCM Holdings, their interests and business activities were sufficiently intertwined, and FXCM Inc. controlled the operations of FXCM Holdings and Forex Capital as they related to the violations.

214.    Plaintiff and members of the Class are each entitled to actual damages sustained for the violations of the CEA alleged herein.

**COUNT NINE**
**For Control Person Liability For Manipulation and Misrepresentation in Violation of the CEA**
**7 U.S.C. § 1, *et seq.***
**Against the Management Defendants and Effex Defendants**

215.    Plaintiff incorporates by reference and reallege each and every paragraph alleged above as though fully alleged herein.

216.    Pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b), "[a]ny person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation."

217.    The Management Defendants and Effex Defendants each knowingly aided, abetted, counsel, induced and/or procured the violations of the CEA by Forex Capital, as alleged herein. Each Defendant did so knowingly and willfully intended to assist these misrepresentations and pricing manipulations, in violation of Section 4b.

218.    Plaintiff and members of the Class are each entitled to actual damages sustained for the violations of the CEA alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief by way of entry of final judgment in her favor, in favor of those she seeks to represent, and against Defendants:

A.      Certifying this action as a class action and appointing Plaintiff as class representatives and her counsel as class counsel;

B.      For a judgment awarding Plaintiff and members of the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C.      For a judgment awarding Plaintiff and members of the Class damages against Defendants for their violations of common law and breach of contract;

D.      Imposing a constructive trust on all monies wrongfully obtained by FXCM;

E.      Directing FXCM to identify, with Court supervision, victims of its conduct and pay them restitution and disgorgement of all monies acquired by FXCM by means of any act or practice declared by this Court to be wrongful;

F.      Awarding attorney's fees and costs;

G.      Granting Plaintiff and the Class such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues which are subject to adjudication by a trier of fact.

DATED:  April 14, 2017                    Respectfully Submitted,

                                          **LEVI & KORSINSKY LLP**

                                          */s/ Shannon L. Hopkins*
                                          Nicholas I. Porritt (NP-5961)
                                          Shannon L. Hopkins (SH-1887)
                                          Sebastiano Tornatore (ST-0304)
                                          30 Broad Street, 24th Floor
                                          New York, New York 10004
                                          Telephone: 212-363-7500
                                          Facsimile:   212-363-7171
                                          shopkins@zlk.com
                                          nporritt@zlk.com
                                          stornatore@zlk.com

                                          - and -

                                          Adam C. McCall*
                                          1101 30th Street, N.W. Suite 115
                                          Washington, D.C. 20007
                                          Telephone: 202-524-4290
                                          Facsimile: 202-333-2121
                                          amccall@zlk.com

                                          *to be admitted* pro hac vice