UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VANTALIE NGUYEN, Individually and
On Behalf of All Others Similarly Situated,

           Plaintiff,

vs.

FXCM INC., FOREX CAPITAL MARKETS,
LLC, FXCM HOLDINGS, LLC, DROR NIV,
WILLIAM AHDOUT, JOHN DITTAMI, and
EFFEX CAPITAL, LLC,

           Defendants.

---

ARTHUR P. CARDI, BIKRAM RANDHAWA,
MARK GOVERS, STEVEN PLUNGER, and
ROSIMARA TADROUS, Individually and On
Behalf of All Others Similarly Situated,

           Plaintiffs,

vs.

FXCM INC., FOREX CAPITAL MARKETS,
LLC, FXCM HOLDINGS, LLC, DROR NIV,
WILLIAM AHDOUT, JOHN DITTAMI, and
EFFEX CAPITAL, LLC,

           Defendants.

Case No.: 1:17-cv-2729-PAC-HBP



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-1-19

Case No.: 1:17-cv-4699-PAC-HBP

**OPINION & ORDER**

---

HONORABLE PAUL A. CROTTY, United States District Judge:

    This is a consolidated securities class action[1], alleging that Defendants failed to disclose a

conflict with Effex Capital, LLC ("Effex"), the leading foreign currency exchange ("forex")

---

[1] On August 17, 2017, the Court consolidated 17 CV 2729 (PAC) and 17 CV 4699 (PAC) under Rule 42(a) of the
Federal Rules of Civil Procedure. (Dkt. 30.)

trading platform for FXCM, Inc., Forex Capital Markets, LLC, and FXCM Holdings, LLC (collectively, "FXCM"). According to Plaintiffs, FXCM hired Defendant John Dittami to create the forex trading platform Effex, which FXCM spun off but retained control over. FXCM presented its forex trading system as designed to produce better results for customers because, unlike the "dealing desk" model, it was inherently conflict-free. But Plaintiffs claim that these representations hid an obvious conflict with Effex, which was winning the majority of orders over banks and other "market makers" because it had secret access to view customers' orders, despite FXCM's promises of anonymity. Plaintiffs also allege that FXCM, through Effex, took positions opposite clients in stark contradiction with FXCM's marketing and engaged in harmful practices that violated the duties and obligations owed to its customers. According to Plaintiffs, Effex and Dittami acted under the direction of FXCM and aided and abetted FXCM's fraud.

In 2017, FXCM entered into settlements with the Commodity Futures Trading Commission ("CFTC") and National Futures Association ("NFA") regarding these practices and undisclosed relationship with Effex, and FXCM agreed to withdraw from operating in the United States.

On October 26, 2017, this Court stayed this action pending arbitration as to claims against Defendants FXCM, Dror Niv, and William Adhout, but not with respect to claims against Defendants Effex and Dittami. (Dkt. 37.) Accordingly, only the six counts (out of eleven total) alleged against Effex and Dittami are at issue here: Counts II, III, IV, V, VI, and X.

Defendants Effex and Dittami move to strike references to settlements with the CFTC and NFA and move to dismiss the six counts at issue pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. After careful consideration of the pleadings and briefing, the Court DENIES the motion to strike and GRANTS the motion to dismiss without prejudice.

2

# BACKGROUND

## I.     FXCM Develops No Dealing Desk Model

According to the Amended Consolidated Class Action Complaint (Dkt. 48) ("Complaint" or "Compl."), FXCM was an online provider of forex trading services that offered a platform for customers to invest in the forex market—the largest and most actively traded financial market in the world. (Compl. ¶¶ 55, 57.) Forex trading involves the exchange of one currency for another. (*Id.* ¶ 56.) Trades on the forex market usually occur in over-the-counter transactions with a dealer rather than through a central exchange, making them less regulated, more reliant on the "market makers" or dealers who buy and sell currencies, and more susceptible to manipulation than trading in other markets. (*See id.* ¶¶ 55-56, 65-67.)

In 2007, FXCM transitioned from a "dealing desk" model for executing forex trades, in which a division of FXCM determined prices offered and took positions opposite to customers, (*id.* ¶ 59), to an "agency" or "no dealing desk" ("NDD") model, in which price quotations were provided by third-party market makers to customers whose orders were to be kept confidential, (*id.* ¶ 60).

## II.     Effex Becomes Market Maker For FXCM

In 2009, FXCM hired a high frequency trader, Dittami, to create a high frequency trading algorithm for the new NDD model. (*Id.* ¶¶ 102-03.) Dittami's contract with FXCM guaranteed him a base salary plus 30% of any profits generated by the system, with FXCM retaining the remaining 70% (the "Rebate Payments"). (*Id.* ¶¶ 103-104.) In 2010, this high frequency trading system spun off from FXCM and became a new company—Effex—where Dittami went to work with the same profit-splitting agreement. (*Id.* ¶¶ 106-108.) Though Dittami had technically

resigned from FXCM, he continued to work at FXCM's offices in New York rent-free for a year and use FXCM's servers and email systems. (*Id.* ¶¶ 110-11.)

Effex paid FXCM monthly for order flow through the Rebate Payments.[2] (*Id.* ¶ 113.) FXCM allowed Effex to win all ties with other market makers, shared other market makers' price quotations with Effex, and added smaller markups to Effex's prices than it added for other market makers. (*Id.* ¶ 117.) As a result, Effex won a disproportionately higher percentage of orders compared to other market makers, potentially depriving customers of better prices. Effex's monthly payments to FXCM totaled nearly $80 million, and Effex captured over 50% of FXCM's daily order flow. (*Id.* ¶ 140.)

## III.  FXCM's Relationship With Effex

FXCM was not forthcoming about its relationship with Effex. (*See* Compl. ¶ 90.) For example, in its 2010 Annual Report, FXCM included a graphic showing the percentage of volume of each liquidity provider on the NDD platform: BNP (13.5%); Citi (8.0%); Citi-Prime Broker (All Others) (35.8%); Deutsche Bank (3.5%); Dresdner (13.3%); Goldman (14.4%); JP Morgan (3.6%); Morgan Stanley (8.0%). (*Id.* ¶ 145.) The 35.8% of trades executed by "Citi-Prime Broker (All Others)" was mostly, if not completely, attributable to Effex. (*Id.* ¶ 147.)

In September 2012, in a rare if not singular public recognition of any relationship with Effex, FXCM's Brand Ambassador stated on an online forum that "FXCM does not own [Effex], nor do they have control over what orders can go to other liquidity providers." (*Id.* ¶ 149.)

---

[2] Effex made payments for monthly order flow from 2009 through at least 2014. (Dkt. 58 Ex. 6 at 2.)

## IV.   FXCM's Representations about NDD[3]

According to FXCM, the NDD model was at the "heart" of FXCM's business, (*id.* ¶ 82), and was uniquely suited to eliminate conflicts of interest and price manipulation, providing a better result for the customer, (*see id.* ¶¶ 61, 77, 78, 81, 83, 85, 162, 164, 166, 168, 170). The NDD model was supposed to anonymize customers' orders so that market makers would compete to offer the best available price to customers and could not stake out positions contrary to customers. (*See id.* ¶ 79.) At the same time, as FXCM explained in its client agreements with Plaintiffs, the NDD model was supposed to be transparent and fair, because FXCM's profits depended on standardized markups, rather than taking positions contrary to customers. (*Id.* ¶¶ 60, 81, 94, 95-97.) To put it in FXCM's own words from its website[4]:

> FXCM makes an identical amount of money in the form of pip markups (which are really commissions) regardless of whether the customer made or lost money on the account. FXCM receives prices from global banks, financial institutions, and other market makers in the foreign exchange markets. A best bid/offer engine sorts those prices and marks them up with our standard markup on the majors. This markup acts as the commission on the trade. When a customer clicks on a price, they are actually clicking on a price from the bank that currently has the best bid or offer, plus our markup. Given that we make money on a per trade basis, we are motivated to encourage size and high frequency and it is why we offer extra incentives to clients. It's also why we dedicate a lot of resources in trying to improve client profitability so they have the money to stay around and trade in bigger sizes. We don't benefit from customer losses.

(*Id.* ¶ 159.)

FXCM also represented that the NDD model was superior because it could pass on price improvements to customers by mitigating "negative slippage"[5] and/or realizing the benefits of

---

[3] Plaintiffs allege that FXCM misrepresented its NDD model from 2010 to 2016. (Compl. ¶¶ 77-85, 95, 144, 158.)

[4] The Court takes judicial notice of the contents of FXCM's website. *Volpe v. Am. Language Commc'n Ctr., Inc.*, 200 F. Supp. 3d 428, 430 (S.D.N.Y. 2016), *aff'd*, 692 F. App'x 51 (2d Cir. 2017) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.")

[5] "Slippage" is the difference between the expected price of a trade and the price at which the trade is actually executed. (Id. ¶ 86.) "Negative slippage" occurs when a purchase order is submitted and the best available price on

"positive slippage."[6] (*Id.* ¶¶ 86-87.) Plaintiffs assert that FXCM's main selling point throughout the class period[7] can be summed up by the following quote taken from FXCM's website in December 2016:

> With NDD, FXCM acts as a price aggregator. We take the best available bid and best ask prices from our liquidity providers—global banks, financial institutions and other market makers—and stream those prices to your platform. This large, diverse group of liquidity providers makes this model special: The more advantageous the prices, the more order flow the provider receives. Through competition, NDD ensures prices are market-driven and fair.

(*Id.* ¶ 144.)

## V.     Effex Implements Allegedly Abusive Practices

### A.     Hold Timer

At some point, Effex began to take advantage of the benefits of positive slippage in the market rather than passing them along to customers through the use of a Hold Timer, which permitted Effex to delay order execution for a period of time (milliseconds in duration), providing Effex with a "last look" at the order so that it could execute the trade if the market price moved favorably, or reject the trade if it moved unfavorably. (*Id.* ¶¶ 122-24.) Because Effex was taking positions opposite the customer, the Hold Timer and "last look" allowed Effex to selectively execute trades: where the price at the end of the Hold Timer had moved against Effex and in favor of the customer, Effex could reject the trade, but where the price had moved in favor of Effex and against the customer, Effex could execute the trade and pass negative price

---

the market is above the requested price; if the transaction goes through, the cost will be higher than the original order. (*Id.* ¶ 121.)

[6] "Positive slippage" occurs when there are sellers on the market who will sell at a price lower than the purchase order; if the transaction goes through, the cost will be lower than the original order. (*Id.* ¶ 120.) The change in price in a positive slippage scenario is often described as a "price improvement."

[7] The alleged class period is March 1, 2010 to February 6, 2017. (Compl. at 1 n. 2.)

slippage to the customer. (*Id.* ¶ 124.) FXCM staff assisted Effex in configuring and adjusting the Hold Timer. (*Id.* ¶ 132.)

### B. Previous Quote

A feature called Previous Quote was also implemented, which allowed FXCM to share customer data with Effex, including the price that would trigger the execution of a customer order (the "Tagged Price"). (*Id.* ¶ 136.) This feature allowed Effex to choose between two trade prices—the Tagged Price or the quotation Effex had submitted to FXCM. (*Id.*) FXCM could thus choose the price that favored FXCM over the customer. (*Id.*) This practice directly contradicted FXCM's representations regarding customer order anonymity. (*Id.* ¶ 79.)

## VI. FXCM Enters Settlement Agreements with Federal Regulators

On February 6, 2017, FXCM, FXCM Holdings, Niv, and Adhout entered into a settlement agreement with the CFTC to pay a $7 million penalty based on these practices and relationship with Effex. (*Id.* ¶ 172-73.) The CFTC order permanently revoked FXCM, Dror Niv, and William Adhout's CFTC registrations, and found that "FXCM engaged in false and misleading solicitations of FXCM's retail foreign exchange (forex) customers by concealing its relationship with its most important market maker and by misrepresenting that its 'No Dealing Desk' platform had no conflicts of interest with its customers." (*Id.* ¶¶ 173, 178.) More specifically, the CFTC found: "FXCM had an undisclosed interest in the market maker that consistently 'won' the largest share of FXCM's trading volume—and thus was taking positions opposite FXCM's retail customers." (*Id.*) The CFTC concluded that Forex Capital, FXCM Holdings, Dror Niv, and William Adhout had "violated Sections 4b(a)(2), 7 U.S.C. § 6b(a)(2), and Regulation 5.2(b), 17 C.F.R § 5.2(b) of the CEA, with Forex Capital, FXCM Holdings, and Niv also violating Section 9(a)(4) of the CEA, 7 U.S.C. § 13(a)(4)." (*Id.* ¶ 179.) The parties who were subject to the settlements did not consent to the use of the order governing the

settlement, or its findings or conclusions, in any other proceedings. (Dkt. 58 Ex. 6 at 1 n.1.) The CFTC order made no findings or conclusions about the culpability of Effex or Dittami.

Also on February 6, 2017, FXCM, Dror Niv, William Adhout, and Forex Capital CEO Ornit Niv, entered into a settlement agreement with the NFA, permanently revoking their membership. (Compl. ¶¶ 176-77.) The NFA decision found that FXCM, Ahdout, and/or Niv had violated numerous NFA Compliance Rules and Financial Requirements. Like the CFTC order, the NFA decision did not make any findings or conclusions about Effex or Dittami. (Dkt. 58 Ex. 7 at 1-3.)

Following the two settlements, FXCM withdrew from operating in the United States and transferred control of all U.S.-domiciled customer accounts to GAIN Capital Holdings, Inc. (Compl. ¶¶ 181-82.) Dror Niv and William Adhout resigned from their positions as members of the FXCM Board of Directors, Dror Niv resigned as Chief Executive Officer, and FXCM changed its name to Global Brokerage Inc. (*Id.* ¶ 183.)

**DISCUSSION**

I.      **Motion to Strike**

    A.      **Standard**

Fed. R. Civ. P. 12(f) permits a court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "To prevail on a motion to strike, a party must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012), *aff'd*, 525 F. App'x 16 (2d Cir. 2013) (Crotty, J.).

There is no absolute rule barring a private plaintiff from relying on settlements with government regulators to meet the requirements of Rule 9(b) for proving fraud and, in fact, there is a strong presumption against striking pleadings. *See Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d at 471. Still, these types of settlements may only be considered at the pleading stage as allegations made "upon information and belief." *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015). Such allegations may not "form the basis of a fraud claim 'except as to matters peculiarly within the opposing party's knowledge.'" *Id.*

### B. Analysis

Effex and Dittami are not parties to and not named in the CFTC settlement, but are discussed generally for their involvement in FXCM's practices. (*See* Dkt. 57 Ex. 6 (discussing "algorithmic trading system" and the "high frequency trader" who created it).) Effex is named in the NFA settlement but is not a party to it; Dittami is not named at all. (*See* Dkt. 57 Ex. 7.) Plaintiffs reference these settlements throughout the Complaint and rely heavily on them for some, but not all of their allegations against the Defendants as a group. For example, Plaintiffs provide some independent factual support for FXCM's misrepresentations. (*See* Compl. ¶¶ 68-100, 142-52.) There are sections of the Complaint that appear, however, to have been lifted nearly verbatim from the CFTC settlement. (*Compare id.* ¶¶ 102-22, 153-57 *with* Dkt. 57 Ex. 6 at 3-7). All of the allegations against Effex and Dittami are derived from the CFTC settlement, without any independent factual support. (*See* Compl. ¶¶ 102-41).

The allegations that have been lifted verbatim from the CFTC settlement are inadmissible, but they can be relied upon by Plaintiffs at the pleading stage as allegations made "upon information and belief." At the pleading stage, Plaintiffs need only allege facts that, upon their information and belief, will likely lead to admissible evidence in discovery. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014). A complaint that relies solely on

allegations made "upon information and belief" fails to meet the pleading requirements of Rule 9(b), but those statements need not necessarily be stricken under Rule 12(f). The inclusion of the settlements in the pleadings may cause prejudice to nonparties Effex and Dittami because they were not adjudicated, do not involve findings or stipulations of fact, and explicitly state that the parties have not consented to their use in any other proceedings. None of the parties who negotiated these settlements represented the interests of Effex or Dittami.

Still, the CFTC and NFA settlements have bearing on the issues in the case. Defendants cite to *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) to argue that they do not. In *Lipsky*, however, the Second Circuit recognized that a district court should ordinarily not strike portions of a complaint at the pleading stage, but stated that it was affirming the District Court's decision to do so on the limited facts of the case. *Lipsky*, 551 F.2d at 893. The consent judgment at issue in *Lipsky* was between the government agency and a private corporation other than the defendant, as is the case here, but the subject matter of the CFTC and NFA settlements in the present case are directly relevant to and form the basis of the claims against Effex and Dittami. By contrast, in *Lipsky*, the consent judgment was not directly relevant to the issues in dispute, it was being offered for a limited purpose, and the court found that striking it would result in no harm to the plaintiff. *Id.* at 893-94. The CFTC and NFA settlements have bearing on the issues here because they reference Effex and Dittami in a general sense and make claims about their contributions to FXCM's fraudulent scheme. Moreover, the settlements make explicit allegations against FXCM, which are relevant to the dispute against Effex and Dittami because Effex and Dittami are alleged to have aided and abetted those violations.

The motion to strike references to the CFTC and NFA settlements is DENIED.

## II.    Motion to Dismiss

### A.    Subject Matter Jurisdiction

As an initial matter, Plaintiffs' claim that Defendants have waived a challenge to subject matter jurisdiction by not moving to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) is flatly wrong. Subject matter jurisdiction can never be forfeited or waived, and courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

Next, Defendants claim that Plaintiffs cannot establish an amount in controversy exceeding $5,000,000 under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because Plaintiffs are not permitted to aggregate their damages, (Dkt. 58 at 3). This, however, fails to recognize that "CAFA explicitly provides for aggregation of each class member's claims in determining whether the amount of controversy is at least $5,000,000." *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 59 (2d Cir. 2006). The case Defendants cite to claim that Plaintiffs cannot aggregate their damages precedes and is not pleaded under CAFA. *See Gilman v. BHC Sec., Inc.*, 104 F.3d 1418, 1424 (2d Cir. 1997).

Moreover, even if plaintiffs cannot satisfy the amount in controversy requirement of CAFA, they can establish subject matter jurisdiction by identifying individual plaintiffs' independent damages in excess of $75,000. *See* 28 U.S.C. § 1332(a); *see also Dimich v. Med-Pro, Inc.*, 304 F. Supp. 2d 517, 519 (S.D.N.Y. 2004) (class members must show that individual claims exceed $75,000); *Faden Bayes Corp. v. Ford Motor Co.*, No. 97 CIV. 1867 (MBM), 1997 WL 426100, at *1 (S.D.N.Y. July 30, 1997) ("[E]ach class member's claims must exceed the $75,000 minimum.").

The Court assumes that Plaintiffs have not waived their ability to bring a class action against Effex and Dittami, who are not signatories to the client agreements signed by Plaintiffs

containing class action waiver. Here, Plaintiffs pleaded that the proposed class of over 100 members, which are minimally diverse, has claims exceeding $5,000,000 in the aggregate, exclusive of interests and costs. (Compl. ¶ 21.) The Court assumes these pleadings are sufficient to assume subject matter jurisdiction at the pleading stage.

## B.     Failure to Plead with Particularity

A pleading stating a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Additionally, while a plaintiff may plead facts alleged upon information and belief where the belief is based on factual information that makes the inference of culpability plausible, such allegations must be accompanied by a statement of the facts upon which the belief is founded." *Schorr v. Dopico*, 205 F. Supp. 3d 359, 363 (S.D.N.Y. 2016), *aff'd*, 686 F. App'x 34 (2d Cir. 2017) (internal citations and quotation marks omitted).

To adequately plead fraud or mistake, a plaintiff must satisfy the requirements of Rule 9(b), and allegations pleaded "upon information and belief" must involve "facts [that] are peculiarly within the opposing party's knowledge" and must "be accompanied by a statement of facts upon which the belief is founded." *Stern v. Leucadia Nat. Corp.*, 844 F.2d 997, 1003 (2d Cir. 1988); *see also Myun-Uk Choi v. Tower Research Capital LLC*, 165 F. Supp. 3d 42, 47 (S.D.N.Y. 2016) ("If a particular manipulation claim sounds in fraud, it must comply with Rule 9(b); if it does not sound in fraud, it need not comply with Rule 9(b).").

In their Complaint, Plaintiffs state that their allegations are:

> based upon personal knowledge as to their own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through their attorneys, which included, among other things, a review of Securities and Exchange Commission . . . filings by FXCM, orders issued by the United States Commodity Futures Trading Commission . . . and the National Futures Association . . . , and media and other available information about the Defendants.

(Dkt. 58 Ex. 1 at 1-2.) While this statement may be true with respect to claims against all of the Defendants in the aggregate, when it comes to Effex and Dittami—the only two Defendants for whom this action has not been stayed—all of Plaintiffs' allegations are made "upon information and belief."[8] (*See* Dkt. 58 Ex. 1 at 1-2.) *See Loreley*, 797 F.3d at 180. Because the allegations against Effex and Dittami are not buttressed by other factual support in the Complaint, they do not meet the particularity requirement of Rule 9(b). Defendants' motion to dismiss the Complaint for failing to plead allegations with the requisite particularity is GRANTED.[9]

## C.    Failure to State a Claim

To survive a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must construe the factual allegations contained in the complaint as true and view the complaint in the light most favorable to plaintiffs. *Twombly*, 550 U.S. at 572.

At the motion to dismiss stage, the court "assess[es] the legal feasibility of the complaint," but does not "assay the weight of the evidence which might be offered in support thereof." *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011). "When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the Complaint as exhibits or incorporated in it by reference." *Fraser v. Fiduciary Tr. Co. Int'l*, 417

---

[8] To the extent Effex or Dittami can be said to have aided and abetted FXCM's misrepresentations, the aiding and abetting charges still lack factual support beyond the CFTC and NFA settlements.

[9] Defendants also argue that Plaintiffs' failure to differentiate which damages are attributable to Effex and Dittami violates Rule 9(b). (Dkt. 58 at 4.) For the reasons set forth below, Defendants' 12(b)(6) motion to dismiss is granted without prejudice for Plaintiffs' failure to specify *any* damages. Still, in the event Plaintiffs decide to replead, the Court notes that an amended complaint would benefit from greater specificity with respect to the allegations and damages attributable to Effex and Dittami—the Defendants for whom the case has not been stayed.

F. Supp. 2d 310, 317 (S.D.N.Y. 2006) (Crotty, J.) (citing *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

A claim is facially plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* The Court need not accept as true, "legal conclusions, deductions, or opinions couched as factual allegations." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

## 1. FEDERAL CLAIMS

Plaintiffs were unaware of FXCM's relationship with Effex and Dittami, which forms the basis of the alleged fraud, until the CFTC Order was published on February 8, 2017. The statute of limitations was estopped and does not bar Plaintiffs' CEA claims. *See In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 513-14 (S.D.N.Y. 2004); *Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 539 (S.D.N.Y. 2017).

### a. Count II – Aiding and Abetting a Violation of the Commodity Exchange Act

The Commodity Exchange Act ("CEA") is a "remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *Loginovskaya v. Batratchenko*, 764 F.3d 266, 270 (2d Cir. 2014). The statute provides a private right of action against anyone "who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter . . . for actual damages"

resulting from transactions involving "any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap."[10]  7 U.S.C. § 25(a)(1).

Sections 4b(a)(2)(A) and (C), 7 U.S.C. § 6(a)(2), make unlawful "any contract of sale of any commodity for future delivery . . . to cheat or defraud or attempt to cheat or defraud the other person" or "willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract. . . ." A private action for fraud under this section requires: (1) "the making of a misrepresentation, misleading statement, or a deceptive omission"; (2) scienter; (3) materiality; and (4) reliance. *Commodity Futures Trading Comm'n v. Int'l Fin. Servs. (New York), Inc.*, 323 F. Supp. 2d 482, 499 (S.D.N.Y. 2004) (citation omitted).

Plaintiffs have a private right of action for violations of the CEA only when they have suffered "actual damages" from the transactions at issue. *See* 7 U.S.C. § 25(a)(1). "To establish 'actual damages' a plaintiff must show an 'actual injury caused by the violation.'" *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 667 (S.D.N.Y. 2016) (*quoting In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013)).

The Complaint does not indicate that Plaintiffs suffered any actual damages as a result of Defendants' alleged fraud.  Instead, Plaintiffs only assert speculative and unsupported statements that:

> As a direct result of Defendants' deceptive practices and actions as alleged herein, Plaintiffs were damaged in that Plaintiffs would not have placed orders with Effex on FXCM's platform had they known of the conflict of interest and that Effex and FXCM were knowingly trading against and profiting from Plaintiffs and subjecting Plaintiffs' orders to inferior executions through deliberate abuses, all to the financial detriment and harm of Plaintiffs.

---

[10] The Court need not determine whether the forex transactions at issue here are regulated by the CEA, as the issue was improperly raised for the first time in Defendants' Reply and the Court is dismissing the Complaint pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).

(Compl. ¶ 175.)

Plaintiffs claim that they identified "the specific harm that FXCM's customers, including Plaintiffs, suffered as a result of" "FXCM and Defendants' abusive conduct" in ¶¶ 123-38 of the Complaint. (Dkt. 62 at 21.) But these paragraphs only discuss general practices and hypothetical scenarios regarding the Hold Timer and negative slippage through which Plaintiffs *could* have been injured, rather than any actual instances where Plaintiffs *did* suffer actual harm or damages. (*See* Compl. ¶¶ 123-28.) This does not provide "'some indication' of actual loss suffered." *Loreley*, 797 F.3d at 187.

Plaintiffs' damages claims are too generalized and hypothetical to establish the requisite indication of loss suffered. Presumably, Plaintiffs know the orders they placed, and whether those orders were filled at the same, better, or worse price than the initial price quotation. Yet Plaintiffs here provide no accounting of actual losses suffered or analyses of potential damages based on assessments of orders actually placed.[11] *See Crago v. Charles Schwab & Co.*, 2017 U.S. Dist. LEXIS 215871, at *19-20 (N.D. Cal. 2017) (plaintiffs analyzed damages sustained by pointing to actual customer orders placed at certain prices that they alleged were executed in unfavorable conditions causing losses); *Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 490 (S.D. Fla. 1996) (damages were amount plaintiffs invested based on misrepresentation or omission, where plaintiffs actually pointed to losses suffered); *Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 416 (S.D.N.Y. 2017), *aff'd as modified*, 889 F.3d 104 (2d Cir. 2018) ("The plaintiffs' failure to allege a single specific transaction that lost value as a result of the defendants' alleged misconduct precludes a plausible allegation of actual injury.")

---

[11] There is no bright line rule requiring plaintiffs to plead loss *causation* under the CEA, as required for claims under the Exchange Act. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Still, Plaintiffs must plead damages beyond mere speculation.

Moreover, as there might have been days where Plaintiffs were actually helped by the relationship between FXCM and Effex and the lower markups placed on orders to Effex, it is insufficient to allege that losses are conceivable without more particularity. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 461 (S.D.N.Y. 2014) (where plaintiffs may have been helped, rather than harmed, on some days by manipulation of LIBOR market, "damages are merely 'conceivable'—and thus insufficiently pled").

Plaintiffs cannot save their claims by pointing to the Rebate Payments as equal to their losses, as they are not indicative of any damage. There are no allegations regarding what dollar amount or percentage of Effex's profits or the Rebate Payments made to FXCM would be attributable to Plaintiffs' losses; nor is there any analysis about the difference between Effex's profits compared to the profits of other market makers to whom FXCM routed orders who did not receive preferential treatment or make Rebate Payments back to FXCM. Further, as Defendants point out, even if "the Rebate Payments constitute[d] damages, they were received by FXCM so any claims seeking damages arising therefrom should be asserted against the recipient, FXCM, not Effex or Dittami." (Dkt. 58 at 4.) As Plaintiffs have failed to specify any losses, the motion to dismiss Count II against Effex and Dittami is GRANTED.

b.     Count III – Principal/Agent Liability

As indicated *supra* § 1.a., Plaintiffs have not provided any factual support that they suffered any actual damages. Just as Plaintiffs could not sustain a claim for aiding and abetting a CEA violation, they also cannot sustain a claim for principal/agent liability for CEA violations. Effex and Dittami's motion to dismiss Count III is GRANTED.

2.     **STATE LAW CLAIMS**

Plaintiffs' state law claims, which do not bear on the operations of the commodities market, are not pre-empted by the CEA. *See Jarvis v. N. Am. Globex Fund, L.P.*, 823 F. Supp.

2d 161, 165 (E.D.N.Y. 2011). This Court, however, may decline to exercise its supplemental

jurisdiction and dismiss the state law claims since it is dismissing all claims over which it has

original jurisdiction. *See* 28 U.S.C. § 1367(c); *Cont'l Fin. Co. v. Ledwith*, No. 08 CIV.

7272PAC, 2009 WL 1748875, at *6 (S.D.N.Y. June 22, 2009). But even if the Court were

inclined to exercise supplemental jurisdiction over Plaintiffs' state law claims, their claims

would still be dismissed under Fed. R. Civ. P. 12(b)(6).

### c. Count IV – New York General Business Law § 349

N.Y. Gen. Bus. Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct

of any business, trade or commerce or in the furnishing of any service," and provides a private

right of action for persons injured by violations of this section. "[A]s a threshold matter,

plaintiffs claiming the benefit of section 349—whether individuals or entities . . .—must charge

conduct of the defendant that is consumer-oriented." *In re Libor-Based Fin. Instruments*

*Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 4634541, at *84 (S.D.N.Y. Aug. 4, 2015),

*amended sub nom. In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262

(NRB), 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015) (quoting *Oswego Laborers' Local 214*

*Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995)).

Plaintiffs do not meet this threshold, as forex trading is not consumer-oriented conduct.

*See Axiom*, 234 F. Supp. 3d at 537 (S.D.N.Y. 2017).

> Individuals do not trade FX the way they purchase traditional consumer products.
> Similar to securities, FX is traded as investments, not as goods to be consumed or used.
> The average consumer is even less likely to transact in FX than in some securities
> because . . . the vast majority of FX trading occurs 'over the counter' between two
> counterparties rather than on a centralized exchange.

*Id.* Plaintiffs have not plausibly alleged that Effex and Dittami's conduct had "a broader impact

on consumers at large." *Id.* (quoting *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at

25). Effex and Dittami's motion to dismiss is GRANTED with respect to Count IV.

d.    <u>Count V – California Unfair Competition Law § 17200 et seq.</u>

California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "California, unlike New York, does not require that an improper practice be directed at ordinary individual consumers. The California statute does not mention consumers, but California cases ask whether the practice affects customers and the public generally or a single, specially situated party." *In re Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541, at \*86. Plaintiffs must show that they have "suffered injury in fact and [have] lost money or property as a result of the unfair competition" to "maintain a claim under the UCL." Cal. Bus. & Prof. Code § 17204; *Walker v. USAA Cas. Ins. Co.*, 474 F. Supp. 2d 1168, 1172 (E.D. Cal. 2007), *aff'd sub nom. Walker v. Geico Gen. Ins. Co.*, 558 F.3d 1025 (9th Cir. 2009).

Plaintiffs have not sufficiently pleaded that Effex or Dittami "purposefully directed" their activities at California residents to sustain jurisdiction over them. *See Yu v. Signet Bank/Virginia*, 69 Cal. App. 4th 1377, 1387, 82 Cal. Rptr. 2d 304, 310 (1999). Effex and Dittami could not have "reasonably anticipate[d] being haled into court" in California—Effex is a New Jersey entity who took no actions in California, and neither Effex nor Dittami entered directly into any contracts with Plaintiffs from California. *Id.* at 311. Effex and Dittami did not deliberately reach out to initiate business with Plaintiffs, who were not unwitting consumers needing protection. *Id.*

Moreover, plaintiffs asserting a UCL claim must plead that that have "suffered injury in fact and ha[ve] lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204; *see also Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1156, 1162 n.1 (N.D.

19

Cal. 2011) (explaining that "Proposition 64, approved by California voters in 2004, imposed new standing requirements on UCL plaintiffs" to require proof of injury); *Branick v. Downey Sav. & Loan Assn.*, 39 Cal. 4th 235, 241-42 (2006) ("Proposition 64, as applied to pending cases, does not permit uninjured private persons to file or to continue prosecuting actions under the unfair competition law.") The Plaintiffs have not done so. The motion to dismiss Count V as against Effex and Dittami is GRANTED.

### e. Count VI – Unjust Enrichment

"The basic elements of an unjust enrichment claim in New York [are] that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). "In addition, to state a claim for unjust enrichment, there must be some relationship between the parties, though it need not be as close as privity of contract." *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d at 532.

Plaintiffs have not alleged a sufficient nexus between Plaintiffs and Effex and/or Dittami to sustain a claim for unjust enrichment. Effex and Dittami were not parties to any contracts with Plaintiffs, nor did they have "direct dealings or some sort of quasi-contractual relationship" with them. *Jet Star Enterprises, Ltd. v. Soros*, No. 05 CIV. 6585 (HB), 2006 WL 2270375, at *5 (S.D.N.Y. Aug. 9, 2006). The order flow that Effex captured was routed through FXCM. Indeed, it is obvious that Plaintiffs never interacted with Effex or Dittami, since Plaintiffs' primary complaint is not knowing of the existence of Effex or of FXCM's preferential treatment of Effex. (*See, e.g.*, Compl. ¶¶ 130-37.) Under these circumstances, Plaintiffs have not made the requisite showing for unjust enrichment. *See Jet Star*, 2006 WL 2270375 at *5. The motion to dismiss Count VI as against Effex and Dittami is GRANTED.

    f.    Count X – Aiding and Abetting Breach of Fiduciary Duties and the Duty of Best Execution

"[I]ndividuals in positions of trust, such as attorneys, general partners or, more relevantly, investment advisors, are subject to liability for breach of fiduciary duty when they deceive or defraud their clients." *Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 471 (S.D.N.Y. 2007). New York law also imposes liability for aiding and abetting breach of fiduciary duty, where a plaintiff has established three elements: "(1) a breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach." *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009) (quoting *In re Sharp Int'l. Corp.*, 403 F.3d 43, 49 (2d Cir.2005)).

As discussed *supra* § 1.a., Plaintiffs have failed to plead any actual damages. Effex and Dittami's motion to dismiss Count X is DISMISSED.

## CONCLUSION

Plaintiffs have failed to plead with particularity violations of the CEA against Effex and Dittami as required under Rule 9(b). Plaintiffs have also failed to state a claim upon which relief can be granted under Rule 12(b)(6) for violations of the CEA, New York General Business Law, California Unfair Competition Law, Unjust Enrichment, or Aiding and Abetting Breach of Fiduciary Duties and the Duty of Best Execution.

The Court DENIES Defendants' motion to strike references to CFTC and NFA settlements, but GRANTS Defendants' motion to dismiss without prejudice under Rule 9(b) and Rule 12(b)(6). The Clerk of Court is directed to close the motion at Dkt. 55, enter judgment in favor of Defendants, and close the case.

Dated: New York, New York
     February _1_, 2019

SO ORDERED

PAUL A. CROTTY
United States District Judge